Linda J. MILLER

v.

UNITED STATES of America.

Civ. A. No. 81–0916.

United States District Court,
E.D. Pennsylvania.

April 15, 1983.

See also 530 F.Supp. 611.

Frederick Klepp of Beasley, Hewson, Casey, Colleran, Erbstein & Thistle, Philadelphia, Pa., for plaintiff.

Susan Dein Bricklin, Asst. U.S. Atty., Philadelphia, Pa., for defendant.

## OPINION

JOSEPH S. LORD, III, Senior District Judge.

Defendant, the United States of America, has moved for summary judgment under Federal Rule of Civil Procedure 56 in this action brought under the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671 et seq.[1]

As to plaintiff Bruce Johnston, Jr., I will deny defendant's motion for summary judgment. Because there was no duty owed to Robin Miller as a matter of law, and the facts when viewed in the light most favorable to the plaintiff do not establish that the defendant undertook to protect Robin Miller, I will grant defendant's motion for summary judgment as to Linda Miller, the Administratrix of Robin's estate.

### I. *Facts*

The evidence, when taken in the light most favorable to the plaintiff, establishes the following facts: Sometime between May of 1978 and August 25, 1978, plaintiff, Bruce Johnston, Jr. (Bruce Jr.) an inmate at Chester County Prison, began to cooperate with the FBI and Pennsylvania State Troopers in an investigation into a series of burglaries and thefts committed by members of Bruce Jr.'s family and their associates (Johnston gang).

Several times in August, 1978, Bruce Jr. accompanied FBI Special Agent David Richter and State Police Officer, Thomas Cloud to identify sites of robberies conducted by the Johnston gang.

In early August, 1978, Bruce Jr. testified before the Federal Grand Jury about the criminal activities of his father, Bruce A. Johnston, Sr. (Bruce Sr.) and his associates.

Between May of 1978 and August 25, 1978, Bruce Jr. met approximately two dozen times with state and federal law enforcement officers. At the initial meeting, Bruce Jr. discussed protection with the officers and told them that he did not want protection. FBI Agent Richter was present at the meeting. At some of the later meetings, Cloud, Richter, and Bruce Johnston, Jr. discussed protection again. Richter told Bruce Jr. more than once that if Bruce Jr. changed his mind, that he should call Cloud who would in turn contact Richter to arrange Bruce Jr.'s protection (Bruce Jr.'s deposition at 12).

On August 17, 1978, in order to assure Bruce Jr.'s protection, he was transferred from Chester County Prison to Lancaster County Prison. He was released on August 25, 1978. From the date of his release until August 30, 1978, Bruce Jr. lived with Robin Miller in plaintiff Linda Miller's home. During that time, Bruce Sr. called the Miller household several times in search of his son, Bruce Jr. Bruce Jr. feared for his life. Following Bruce Jr.'s instructions, Robin Miller repeatedly told Bruce Sr. that Bruce Jr. was still in jail. Between August 26, 1978 and August 29, 1978, Bruce Jr. called Cloud four times to ask for protection. On one of these occasions, Bruce Jr. spoke directly with FBI Special Agent Richter, who was at the State Police Barracks with Cloud when Bruce Jr. called. Bruce Jr. told both Richter and Cloud that he was afraid that his life was in danger.

On August 30, 1978, Bruce Jr. and Robin Miller were ambushed. Robin was killed and Bruce Jr. was injured.

The questions that I must decide in determining whether summary judgment is appropriate in this case are: (1) when viewed in the light most favorable to the plaintiffs, do the facts support plaintiffs' allegations

---

1. The provisions of the FTCA are scattered throughout various sections of the United States Code.

that the federal government undertook[2] to protect Bruce Jr. and Robin Miller and performed the undertaking negligently; and (2) in the absence of a specific undertaking to protect, is there a duty to protect Bruce Jr. and Robin Miller?

## II. *Applicable Law*

The FTCA requires that I look to state law to determine whether the government should be liable in this case. 28 U.S.C. § 1346(b) states:

> [T]he district courts, . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where

the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

■ The federal government argues, however, that the Witness Protection Program, established by Title V of the Organized Crime Control Act of 1970, 84 Stat. 922 *et seq.,* is the only possible source of a duty to protect a federal witness. I cannot accept the government's argument.[3]

■ There is no indication anywhere in the legislative history of the FTCA that the Congress intended to exclude suits by federal witnesses against the federal government where the state law would impose a duty on state law enforcement authorities.[4] Moreover, neither the simple language of Title V of the Organized Crime Control Act of 1970[5] nor any of its legislative history

---

**2.** At the outset, it must be made clear that the words "undertake", "undertook" and "undertaking" are used in two senses: (1) the actual physical or contractual embarkation on a course of affirmative action involving the victim, discussed under the Good Samaritan Rule, *infra;* (2) the duty that the law imposes because of a "special relationship," discussed under that rationale, *infra.*

**3.** If the Federal Witness Program were considered the only possible source of a duty to protect, I would be compelled to grant defendant's motion for summary judgment against Bruce Jr. 28 U.S.C. § 2680(a) of the FTCA provides:

> The provisions of this chapter and section 1346(b) of this title shall not apply to (a) any claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

The decision to place or not to place someone in the Witness Protection Program is a policy decision shielded by the discretionary function exception. *Bergmann v. United States,* 689 F.2d 789 (8th Cir.1982). Because the discretionary function exception creates a jurisdictional bar, *Griffin v. United States,* 500 F.2d 1059 (3d Cir.1974), I can not even examine the decision not to place Bruce Johnston, Jr. and Robin Miller in the Witness Protection Program. In his earlier opinion in this case, Judge Luongo refused to dismiss partially because the complaint could be construed to allege that the government made the decision to protect and carried out its decision negligently. 530 F.Supp. 611 (E.D.Pa.1982).

After protracted discovery, the only evidence that the government had decided to protect plaintiffs is Bruce Jr.'s testimony that FBI Agent Richter told Bruce Jr. that he should call if he wanted protection. Because policy regulation OB 2110 specifically states that federal agents are not authorized to place anyone in the Witness Protection Program, Richter's comments to Bruce Jr. do not even raise a question of fact as to whether the government had decided to place Bruce Jr. in the program.

**4.** "[A] municipal corporation can be considered a private individual for the purpose of testing governmental liability." (footnotes omitted), Jayson, L. 1 *Handling Federal Tort Claims* § 217.02 (1982).

**5.** Section 501. The Attorney General of the United States is authorized to provide for the security of Government witnesses, potential Government witnesses, and the families of Government witnesses and potential witnesses in legal proceedings against any person alleged to have participated in an organized criminal activity.

Section 502. The Attorney General of the United States is authorized to rent, purchase, modify or remodel protected housing facilities and to otherwise offer to provide for the health, safety, and welfare of witnesses and persons intended to be called as Government witnesses, and the families of witnesses and persons intended to be called as Government witnesses in legal proceedings instituted against any person alleged to have participated in an organized criminal activity whenever, in his judgment, testimony from, or willingness to testify by,

states or even implies that Congress by its enactment intended to limit the waiver of sovereign immunity granted under the FTCA. Furthermore, the Organized Crime Control Act does not create any independent private right of action against the federal government. *Garcia v. United States,* 666 F.2d 960 (5th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 73, 74 L.Ed.2d 72 (1982). *Leonhard v. United States,* 633 F.2d 599 (2d Cir.) *cert. denied,* 451 U.S. 908, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1908). A federal witness, however, may bring a suit under the FTCA, alleging that the government negligently failed to provide adequate protection if the government has undertaken to protect the individual and done so negligently or if a duty to protect exists under state law. *Leonhard,* 633 F.2d at 623 n. 35.

### III. *Good Samaritan Rule*

The first question I must address is whether the facts when viewed in the light most favorable to the plaintiffs support the position that the FBI had undertaken under the Good Samaritan test to protect Bruce Jr. and Robin Miller. If so, the Good Samaritan Rule as set forth in § 323 of the Restatement (Second) of Torts and adopted by the Pennsylvania courts, *De Jesus v. Liberty Mutual Insurance Company,* 423 Pa. 198, 223 A.2d 849 (1966), would subject the government to liability if the government's failure to exercise reasonable care increased the risk of harm to Bruce Jr. and Robin Miller or the plaintiffs suffered the harm because they relied upon Richter's undertaking. Section 323 states:

> *Negligent Performance of Undertaking to Render Services.* One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking.

There is no evidence whatsoever in the record indicating that Richter performed any action or made any decision to protect Bruce Jr. and Robin Miller.

The only remaining question under the Good Samaritan Rule analysis is whether Richter's comments to Bruce Jr. constitute an "undertaking" sufficient to create liability under the Good Samaritan Rule as adopted by Pennsylvania law. In the Reporter's notes following section 323 of the Restatement (Second) of Torts, the American Law Institute expresses a caveat. The caveat states:

> The Institute expresses no opinion as to whether: (1) the making of a contract or a gratuitous promise, without in any way entering upon performance, is a sufficient undertaking to result in liability under the rule stated in this Section . . .

█ "[I]n Pennsylvania, it is established that essential to a finding of liability [under the Good Samaritan rule] is a particular undertaking in fact, not merely the expectation of one or the legal right to pursue one." *Blessing v. United States,* 447 F.Supp. 1160, 1189 (E.D.Pa.1978). Under the Good Samaritan Rule, the scope of the duty is measured by the extent of the undertaking. *Id.*

The Pennsylvania Supreme Court has suggested that a contractual undertaking may be sufficient to impose liability. *Evans v. Otis Elevator Company,* 403 Pa. 13, 168 A.2d 573 (1961). In *Evans,* the court stated:

> It is not the contract per se which creates the duty; it is the law which imposes the duty because of the nature of the undertaking in the contract.

403 Pa. at 18, 168 A.2d 573.

In *Evans,* the Court found the defendant liable for failing properly to inspect an ele-

---

such a witness, would place his life or person or the life or person of a member of his family or household in jeopardy. Any person availing himself of such an offer by the Attorney Gener-

al to use such facilities may continue to use such facilities for as long as the Attorney General determines the jeopardy to his life or person continues.

vator. The defendant had a written contract with the owner of the elevator to service the elevator. Although the language in the opinion suggests that a contractual undertaking may have been sufficient to impose liability, the defendant had in fact physically undertaken the inspection of the particular elevator alleged to have been defective.

Even assuming that the contract in *Evans* would be sufficient to impose liability under the Good Samaritan Rule, the instant case is distinguishable. In *Evans* there was a written contract that laid out with particularity the duties undertaken by the defendant. The contract defined the nature and scope of the undertaking which in turn would define the scope of the liability.

Here, however, there was no contract. There was, at best, a gratuitous promise. Bruce Johnston, Jr. himself testified that he informed the FBI and state police in order to avenge his father for raping Robin when Bruce Jr. was in prison. Moreover, Bruce Jr.'s deposition testimony shows that he refused protection when first it was offered to him by the police because he wanted to be free to smoke marijuana. There is no evidence that Bruce Jr. gave information to the police for the purpose of gaining favorable treatment from them, or that at the time he gave the information he harbored even an expectation that the FBI would protect him. In fact, Richter's statement that Bruce Jr. should call if he wanted protection was not voiced until after Bruce had begun to give information to the police. Therefore, there was no consideration for Richter's promise to provide protection.

In Pennsylvania, a gratuitous promise without consideration is insufficient to constitute an undertaking under the Good Samaritan Rule.[6]

## IV. *Duty to Protect: Bruce Johnston Jr.*

Because there was no specific undertaking to protect either by action or contract, I must determine whether, absent such an undertaking, Pennsylvania law imposes a duty on a municipality to protect a police informant.

Due to the history of the sovereign immunity doctrine[7] in Pennsylvania, there is little guidance from the Pennsylvania courts as to whether, absent sovereign immunity, a municipality would be liable for failing to provide an individual with police protection from crime.

In the absence of a Pennsylvania Supreme Court decision on the subject, I must predict whether the Pennsylvania Supreme Court would find a municipality liable for failure to provide police protection if a broad waiver of sovereign immunity similar to the FTCA existed in Pennsylvania.[8]

In determining whether the Pennsylvania Supreme Court would find a municipality liable for injuries sustained by a police informant or a witness as a result of giving testimony, I must consider analogous Pennsylvania Supreme Court cases, if any, considered dicta appearing in decisions by the Supreme Court, decisions of lower state courts and other federal courts, scholarly treatises, Restatements, and germane law review articles, particularly those of law schools in Pennsylvania. *McKenna v. Ortho Pharmaceutical Corporation,* 622 F.2d 657

6. *Brown v. T.W. Phillips Gas and Oil Co.,* 195 F.2d 643. *Reitmeyer v. Sprecher,* 431 Pa. 284; 243 A.2d 395 (1968) is distinguishable. That case specifically dealt with the landlord/tenant relationship and adopted § 357 of the Restatement (Second) of Torts. In imposing liability on the landlord to make repairs he had promised to make, the court emphasized in *Reitmeyer* that it was not a case where the promise was not supported by consideration. 431 Pa. at 287.

7. The sovereign immunity doctrine, abrogated in *Ayala v. Philadelphia Board of Public Educa-*

tion, 453 Pa. 584, 305 A.2d 877 (1977), was partially reinstated in 1979 through the Political Subdivision Tort Claims Act, 53 P.S. § 5311.102 *et seq.,* repealed in 1980 and reenacted in 1 Pa.Cons.Stat.Ann. § 2310 and 42 Pa.Cons.Stat.Ann. § 8521 *et seq.*

8. Insofar as a municipality has immunity derived from sovereignty, this analogy may not be drawn, for the very purpose of the tort claims act was to waive that immunity. Jayson, L. 1 *Handling Federal Tort Claims,* § 217.-02 (1982).

(3d Cir.1980). "[R]elevant state precedents must be scrutinized with an eye toward the broad policies that informed those adjudications and to the doctrinal trends which they evince." *Id.* at 662. (footnote omitted). Furthermore, although some weight should be given to lower and intermediate court decisions, those decisions are not binding on the federal tribunal. *Id.*

Only two opinions in Pennsylvania discuss the possibility of municipal liability for failure to provide an individual with police protection: *Chapman v. City of Philadelphia,* 290 Pa.Super. 291, 434 A.2d 753 (1981); *Berlin v. Drexel University,* 10 Pa.D. & C.3d 319 (1979).[9] *Berlin* and *Chapman* held that although the City of Philadelphia has a statutory duty to the general public to provide police protection, that duty cannot be asserted by an individual unless a "special relationship" exists between the city and the individual. According to *Berlin* and *Chapman,* a "special relationship" exists if: (1) the individual has been exposed to special danger and (2) the "authorities have undertaken the responsibility to provide adequate protection." *Berlin,* 10 Pa.D. & C.3d at 328.

The concept of the necessity of a "special relationship" in order to impose a duty to act on an individual stems from the marked distinction between misfeasance and nonfeasance found in negligence actions at early common law. That is, common law imposed liability for negligent performance of an action but did not impose liability for a failure to act. Prosser, William L., *Law of Torts,* § 56 4th ed. (1971). Due to the "difficulties of setting any standards of unselfish service to fellow men," *id.,* the courts have increased the number of instances in which affirmative duties are imposed by expanding the list of special relationships justifying departure from the common law rule rather than by rejecting the common law rule itself. *Tarasoff v. Regents of the University of California,* 131 Cal.Rptr. 14, 23 n. 5, 17 Cal.3d 425, 436 n. 5, 551 P.2d 334,

343 n. 5 (1976). Section 315 of the Restatement (Second) of Torts expresses the common law rule:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
>
> (a) A special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
>
> (b) A special relation exists between the actor and the other which gives to the other a right to protection.

Section 314(a) lists specific "Special Relations Giving Rise to Duty to Aid or Protect." Among those listed are the duties of a common carrier to its passengers, of an innkeeper to her guests, of a possessor of land who holds it open to the public to the members of the public who enter onto the land, and of one who takes custody of another person to the person in custody. This list, however, is not necessarily all-inclusive. A caveat follows the Restatement section stating that the Institute "expresses no opinion as to whether there may not be other relations which impose a similar duty." Comment b states, "the duties stated in this Section arise out of special relations between the parties, which create a special responsibility, and take the case out of the general rule. The relations listed are not intended to be exclusive, and are not necessarily the only ones in which a duty of affirmative action for the aid or protection of another may be found."

Section 314(a) and 315 control in situations where there would generally be no duty to act but in which a special relationship between the parties imposes a duty on one party to act. In contrast, section 323 of the Restatement (Second) of Torts expresses the concept of the Good Samaritan Rule. That section imposes liability on a person not for a failure to act, but rather for a negligent performance of an act which the

**9.** The facts leading to *Chapman* and *Berlin* occurred in the time period between *Ayala* and the enactment of the Political Subdivision Tort Claims Act. This period is the only time in Pennsylvania law when the legal issue of tort liability of municipalities for failure to provide protection was treated by Pennsylvania courts.

actor has voluntarily undertaken. Absent the undertaking, there would be no duty to act and no liability. In Section III of this opinion, I have already found that the FBI did not specifically undertake to provide police protection. The question here, therefore, is not whether there was an undertaking negligently performed, but whether there is a duty to act affirmatively under Pennsylvania law.

The difficulty in deciphering the "special relationship" test enunciated in *Berlin* and *Chapman* is that the courts appear to have confused the special relationship exception to the general lack of tort liability for nonfeasance with the concept embodied in the Good Samaritan Rule that once an individual has undertaken to act, the actor is liable for negligent performance of the action.

The first prong of the "special relationship" test enunciated in *Berlin* and *Chapman* is clear. A member of the public must be exposed to special danger. It is clear that the facts in the instant case would satisfy the first prong of the test: as a result of the information Bruce Jr. gave the FBI and the state police, both Bruce Jr. and Robin Miller were exposed to special danger. The more difficult question is the meaning of the second prong of the test. The language of the second prong of the test, requiring that the authorities have "undertaken" to provide adequate protection, suggests that *Berlin* and *Chapman* did not intend to impose any liability on the police department for nonfeasance. The language of the second prong of the *Berlin* test appears at first blush to incorporate the Good Samaritan Rule articulated in section 323 of the Restatement (Second) of Torts. It is inconceivable, however, that the undertaking to provide protection required by the second prong of the special relationship test would be identical to the "undertaking" for liability to be imposed under the Good Samaritan Rule. Absent sovereign immunity, the Good Samaritan Rule would apply to municipalities as well as to private individuals and the special relationship test enunciated in *Berlin* and *Chapman* would be superfluous.

The courts in *Berlin* and *Chapman* therefore, must have intended the "undertaking" required by the second prong of the special relationship test to be different from and lesser than that required by the Good Samaritan Rule. The cases cited by the *Berlin* opinion support this theory. Distinguishing the case before it, *Berlin* cited three cases as illustrative of a special relationship: *Swanner v. United States,* 309 F.Supp. 1183 (M.D.Ala.1970), *Gardner v. Village of Chicago Ridge,* 71 Ill.App.2d 373, 219 N.E.2d 147 (1966); and *Schuster v. New York,* 5 N.Y.2d 75, 180 N.Y.S.2d 265, 154 N.E.2d 534 (1958). In *Swanner* the court held that the government had a duty to protect a "special employee" of the Internal Revenue Service who had aided in an undercover investigation leading to several indictments. The duty arises according to *Swanner,* "whenever there is reasonable cause to believe that a government agent or employee or any member of his family, is endangered as a result of the performance of his duty to the government ..." *Swanner,* 309 F.Supp. at 1187. *Swanner* did not require a request for protection.

In *Gardner* a crime victim was summoned by police to identify four defendants and was assaulted by those he identified in the presence of the police. The court held that a duty was owed to protect the plaintiff "once the police asked plaintiff to come to the place of apprehension." 219 N.E.2d at 150.

In *Schuster,* the city had a duty to protect a citizen who responded to notices put out by police soliciting information as to the whereabouts of a dangerous fugitive.

The elements common to all three of the cases cited by *Berlin* are: (1) the police solicited information from the plaintiff; (2) the plaintiff aided the government by giving information; (3) the government knew or should have known that the plaintiff was in danger because he provided the government with information. In none of these cases did the government promise to protect or undertake to protect the plaintiff in the Good Samaritan Rule sense of an undertak-

ing.[10] Yet, *Berlin* cites these cases as illustrative of a special relationship that may create municipal liability.

Moreover, both *Schuster* and *Gardner* may help to explain the apparent confusion in the *Berlin* opinion. In both cases, the courts explained that a police department that solicits information from and makes active use of a public citizen as an informant is no longer passive. "They [the police] are active in calling upon the citizen for help, and in utilizing his help when it is rendered. They have gone forward to such a stage ... that inaction in furnishing police protection to such persons would commonly result, not negatively merely in withholding a benefit, but positively or actively in working an injury." *Schuster,* 180 N.Y. S.2d at 269, 154 N.E.2d at 538.

Furthermore, the *Berlin* court distinguished the case before it by stating:

[N]o special circumstances creating a duty from the municipality to the plaintiff as a private individual are present or have been pleaded. Nor is there any element of foreseeability of harm to this particular victim or from the particular source of harm to this individual or any other identifiable member of the public.

*Id.* at 329.

This distinction, drawn by *Berlin* coupled with *Berlin's* citation to *Swanner, Gardner,* and *Schuster* lead to the conclusion that the "undertaking" to protect required by the second prong of the special relationship test is not an undertaking in the Good Samaritan Rule sense.

The "undertaking" in the special relationship test includes a solicitation of information by the government, a response by the plaintiff giving the government valuable information, and knowledge or reason to know on the part of the government that the plaintiff is in danger.

When taken in the light most favorable to the plaintiffs, the facts in the case at bar

satisfy this definition of "undertaking" as far as Bruce Jr. is concerned. The FBI and state police notified Bruce Jr. that they wanted his cooperation. Bruce Jr. gave the government officials valuable information and testified before the Grand Jury. Bruce Jr. notified FBI Agent Richter of his fear of his father.

There was no relationship between FBI Agent Richter and Robin Miller, but a duty could extend to Robin Miller if she were considered Bruce Jr.'s "family" by the Pennsylvania Supreme Court. *Swanner, supra.*

The question then arises whether the Pennsylvania Supreme Court would choose to adopt the special relationship test developed in *Berlin* and impose a duty on a municipality for its failure to protect a police informant and if so, whether that duty would extend to his girlfriend.

In order to predict whether the Pennsylvania Supreme Court would find a Pennsylvania municipality liable for failure to protect a police informant, in addition to considering the *Berlin* and *Chapman* opinions, I must examine the decisions of other jurisdictions. *McKenna, supra.*

Besides the courts deciding *Schuster, Swanner* and *Gardner,* a growing number of courts have recognized that a municipality owes a duty to protect an informant with whom it has a special relationship. *See Leonhard v. United States,* 633 F.2d 599, 623 n. 35 (2d Cir.1980); *Peck v. United States,* 470 F.Supp. 1003, 1017 (S.D.N.Y. 1979); *Crain v. Krehbiel,* 443 F.Supp. 202, 214 (N.D.Cal.1977); *Huey v. Town of Cicero,* 41 Ill.2d 361, 243 N.E.2d 214 (1969); *Massengill v. Yuma County,* 104 Ariz. 518, 523; 456 P.2d 376, 381 (1969); *Henderson v. City of St. Petersburg,* 247 So.2d 23, 25 (Fla.Dist.Ct.App.1971) *cert. denied,* 250 So.2d 643 (Fla.1971)

---

10. In *Schuster,* although the police had granted the plaintiff protection weeks earlier but had withdrawn its protection, the court's holding relied on the existence of a duty to protect rather than on a negligent performance of a duty voluntarily assumed. *See Note: Municipality Liable for Negligent Failure to Protect Informer: The Schuster Case,* 59 Colum.L.Rev. 486 (March, 1959).

These cases rely on the reasoning of the *Swanner, Schuster,* and *Gardner* decisions. The theoretical underpinning of the cases is that a private citizen owes a moral, if not legal, obligation to her government, be it local, state or federal, to aid in the arrest and prosecution of offenders. That obligation engenders a reciprocal duty on the part of the police to protect those cooperating citizens from harm. *Schuster* cited to *In re Quarles,* 158 U.S. 532, 15 S.Ct. 959, 39 L.Ed. 1080 (1895), to support its position:

> [I]t is the duty of government to see that a private citizen may exercise freely the right to notify the enforcement authorities of law violations, 'and to protect him from violence while so doing, or on account of so doing. This duty does not arise solely from the interest of the party concerned but from the necessity of the government itself that its service shall be free from the adverse influence of force and fraud practiced on its agents.'

*Schuster,* 180 N.Y.S.2d at 272, 154 N.E.2d at 539, *quoting In re Quarles,* 158 U.S. at 536, 15 S.Ct. at 961.

Legal commentators have pointed out that important policy considerations encourage the imposition of a duty on a government to protect its informants. The imposition of a duty would encourage citizen cooperation with the police, reward citizens for public service and prevent injury. If a duty did not exist, commentators suggest, potential informants would be fearful and reluctant to aid law enforcement officials. Goldstock, R., Coenen, D., *Controlling the Contemporary Loan Shark: The Law of Illicit Lending and the Problem of Witness Fear,* 65 Cornell L.Rev. 127, 211 (January 1980); *Note, Duty to Protect Citizen Aiding in Law Enforcement,* 32 Temple L.Q. 365, 367 (1959). In contrast, others have argued that economic considerations may militate against a finding of a municipality's duty to protect a police informant. *Schuster,* 180

N.Y.S.2d at 286–87, 154 N.E. at 549. (Froessel, J., dissenting opinion). Predictions of dire financial consequences caused by a finding of municipal liability to an informant for a failure to protect, however, have not materialized. Goldstock and Coenen, *supra.* Goldstock and Coenen opine that the reason these predictions of doom have not come true is that the duty is limited in scope. It does not arise until it reasonably appears that an informant is in danger; the amount of protection given need only be reasonable; and protection may be limited to a reasonable period of time.[11] Goldstock and Coenen, *supra* at 211–12.

■ After careful consideration of *Berlin* and *Chapman,* the cases in other jurisdictions, the policy considerations involved, and the general receptiveness of the Pennsylvania Supreme Court to broadening the imposition of tort liability[12], I predict that if there were no statutory sovereign immunity in Pennsylvania the Pennsylvania Supreme Court would impose a duty on a Pennsylvania municipality to protect a police informant with whom it has established a "special relationship" as defined earlier in this opinion.

## V. Duty to Protect: Robin Miller

■ The last question is whether the Pennsylvania Supreme Court would impose liability on the municipality for injuries sustained by Robin Miller. No facts have been alleged that would impose a duty to protect Robin Miller on her own. Robin Miller had no "special relationship" with FBI Agent Richter. It has not been alleged that the government solicited information from her or that she provided information. Unlike Bruce Jr., Robin did not testify before the Grand Jury. Any duty owed to Robin Miller, therefore, would derive from her relationship with Bruce Jr.

---

11. In many situations the duty to protect may be fulfilled merely by a refusal to disclose the identity of a secret informant. Goldstock and Coenen, *supra* at 213–29.

12. In the area of tort liability, the Pennsylvania Supreme Court has been a forerunner. For a thorough and thoughtful analysis of the developing attitude of the Pennsylvania Supreme Court, *see* Levy, E.S., *Legal Intelligencer,* October 29, 1982.

*Swanner* held that when there is a special relationship between a "special employee" and the government, the government is liable for injuries caused by a failure to protect not only the "special employee" but also the members of his family. The same policies supporting a finding of liability for a failure to protect an informant would encourage an extension of a duty to protect to the informant's family. Because of these policies, the Pennsylvania Supreme Court may choose to extend the duty to family members. Even assuming, however, that the Pennsylvania Supreme Court would extend the duty to protect family members, I am convinced that the Pennsylvania Supreme Court would not extend such a duty to Robin Miller in this case.

Plaintiffs allege that the relationship between Robin Miller and Bruce Jr. was akin to a family relationship and, therefore, under *Swanner,* a duty to protect Robin Miller existed.

There has been a "nationwide flurry" of cases challenging the common law conception of extra-marital relations, *Bulloch v. United States,* 487 F.Supp: 1078, 1080 (D.N. J.1980). Although the Pennsylvania Supreme Court has not spoken on the issue, the Pennsylvania Superior Court has cited favorably the landmark case of *Marvin v. Marvin,* 134 Cal.Rptr. 815 (1976), 18 Cal.3d 660, 557 P.2d 106, establishing that although a contract whose consideration is sexual services is unenforceable as contrary to public policy, the mere cohabitation between parties to a contract does not render the contract unenforceable. *Baldassari v. Baldassari,* 278 Pa.Super. 312, 420 A.2d 556 (1980); *Mullen v. Suchko,* 279 Pa.Super. 499, 421 A.2d 310 (1980); *Banko v. Malanecki,* 291 Pa.Super. 11, 435 A.2d 194 (1981).

The *Marvin* principles, however, involve rights between the parties rather than rights derived from one's relationship to another.

In *Bulloch v. United States, supra,* the court predicted that the New Jersey Supreme Court would expand the *Marvin* principles to a derivative action. The court found that an unmarried woman cohabiting with a man who was injured in a scuba accident had a cause of action for consortium under New Jersey law. The well-reasoned opinion supported its decision in great part by the fact that the New Jersey Supreme Court had adopted the *Marvin* holding in *Kozlowski v. Kozlowski,* 80 N.J. 378, 403 A.2d 902 (1979). The court also relied heavily on the type of relationship enjoyed by the plaintiff and the man with whom she lived. The plaintiff in *Bulloch* had been married for twenty-three years to the man injured in the scuba accident. They had raised two children together. They were divorced after three years of marital discord but had reconciled before the accident and planned to remarry. For nearly three years between the accident and the trial, they lived together. Thus, although they were not married, the Bullochs enjoyed a stable, cohabitative relationship.

The facts in the case at bar differ significantly. First, the Pennsylvania Supreme Court, unlike the New Jersey Supreme Court, has not yet embraced the *Marvin* doctrines. Secondly, the relationship between Bruce Jr. and Robin Miller did not even approach that of a stable couple that had chosen to live together without marriage.[13]

At the time of the shooting, Robin Miller was the fifteen year old girlfriend of Bruce Johnston, Jr. From the time when Bruce Jr. was released from prison until the date of the shooting, Bruce Jr. lived in Robin Miller's mother's home. Besides these few weeks, the only other time when Robin and Bruce Jr. cohabited was for a period of a month or two in the Spring of 1977 (Deposition, Linda Miller). Robin Miller was an unemancipated minor who wanted to marry Bruce Jr., but had not received permission from her mother to do so. The relationship

---

**13.** In advocating extension of consortium rights to unmarried cohabitants, one commentator proposed that the courts examine the type of relationship as a means of deciding whether a non-spouse co-habitant has a claim for consortium. *Note: Extending Consortium Rights to Unmarried Co-habitants,* 129 U.Pa.L.Rev. (1981).

between Bruce Jr. and Robin, therefore, was more akin to a friendship than to that of a cohabiting couple.

Even assuming that the Pennsylvania Supreme Court would be open to the reasoning in the *Bulloch* decision, I believe that the court would refuse to extend a duty to protect Robin Miller under these circumstances.

For the foregoing reasons, I will grant defendant's motion for summary judgment as to plaintiff Linda Miller, and deny defendant's motion as to plaintiff Bruce Johnston Jr.