Hirsch **FRIEDMAN, Jane Elizabeth Friedman, and Darin Michael Friedman**

v.

**UNITED STATES of America.**

Civ. No. C84–1627.

United States District Court, N.D. Georgia, Atlanta Division.

Dec. 11, 1987.

Phillip A. Montalvo, Belleville, Ill., and Hirsch Friedman, Atlanta, Ga., for plaintiffs.

Robert L. Barr, Jr., U.S. Atty., and Nina L. Hunt, Asst. U.S. Atty., N.D.Ga., Atlanta, Ga., for defendant.

## ORDER

ORINDA D. EVANS, District Judge.

This suit for damages under the Federal Tort Claims Act, 28 U.S.C. § 2671, *et seq.*, came before the court for nonjury trial on November 16–25, 1987.

Plaintiff Hirsch Friedman is a practicing attorney in Atlanta, Georgia. At certain times, he acted in an uncompensated undercover capacity for the Federal Bureau of Investigation ("FBI"). He sues the Defendant, the United States, to collect damages flowing from the alleged negligent failure of the FBI to warn him of or otherwise protect him from an alleged threat to his life. Mr. Friedman claims that this failure was the proximate cause of the serious physical injuries he sustained when his car was bombed on August 17, 1982.

Having heard the evidence and arguments of counsel, the court hereby finds and concludes as follows:

Mr. Friedman has been practicing law in Atlanta since approximately 1976. Beginning about 1978, he began representing discos, nightclubs, and other establishments featuring nude entertainment. Eventually he represented the majority of such establishments in Atlanta. In the fall of 1978, he met with persons associated with the "The She Club" to discuss its representation, including the financial arrangements. The meeting was attended by Betty Jo Harris and B.C. Collins, license holders for the Club, Carl Coppola, and others. No one specifically stated to Mr. Friedman that Mr. Coppola owned the Club, but he did, in the sense that he controlled the Club's finances.

Mr. Friedman began representing the She Club in late 1978. This continued through 1979. His representation centered on protecting the Club's liquor and business licenses, which were threatened from time to time because of claimed violations of city ordinances. Ms. Collins and Ms. Harris as license holders were generally the parties in the cases. Mr. Coppola was never a party. Ms. Harris periodically took cash to Mr. Friedman from Mr. Coppola to pay legal fees. There is no evidence that she specifically told Friedman that the money was from Coppola. However, Coppola personally complained to Friedman about the fees.

Mr. Friedman won a trial in early 1979 involving an attempted license revocation. Coppola congratulated Mr. Friedman in the courthouse corridor and invited him to have a celebratory drink that evening. Also, Mr. "T",[1] manager of the She Club, hired Friedman to represent him in a criminal matter. Mr. T paid Mr. Friedman in cash; when he did, he told Friedman the money was "from Carl."

In early 1979, Lenny Lowenstein, a client of Mr. Friedman who owned a nightclub,

---

1. Mr. T is now in prison. He requested that his name not be used.

told Friedman that a city zoning inspector named John Collicott was trying to extort money from him. Mr. Friedman contacted city authorities and was put in touch with City of Atlanta Detective Aubrey Melton. Melton was already investigating a claim that Collicott was trying to extort money from another nightclub owner, David Webb. This was a joint investigation between the City of Atlanta police and the FBI. The two agencies had agreed that FBI Special Agent John McAvoy would be the case agent. After being interviewed by Melton and McAvoy, Mr. Friedman agreed to assist them by discussing the attempted extortion of Lowenstein with Collicott while wearing a concealed body recorder and wire transmitter. Friedman did this. In the conversation, Collicott stated he wanted an expense paid trip to Las Vegas. Friedman, acting for the FBI, agreed to this and accompanied Collicott to Las Vegas, where further discussions were covertly tape recorded.

In the spring of 1979, Special Agent McAvoy and Detective Melton decided that Atlanta night club industry was probably being infiltrated by organized crime. They felt the Gambinos, an organized crime group with whom they associated Carl Coppola, were moving in. They felt that perhaps Ronald Zappi, owner of the Numbers Night Club was a member of the Gambino organization. At some point, Melton developed the theory that John Collicott, the city zoning inspector, was actually working for the Gambino interests in seeking to put night clubs not associated with the Gambinos out of business.

Also in the spring of 1979, Agents Melton and McAvoy asked Mr. Friedman to assist them in investigating a Miami-based distributor of pornographic materials who was believed to have a tie-in with organized crime; specifically, the Gambinos. They asked Mr. Friedman to accompany them to Miami, visit the distributor's premises, and engage the principals in conversation while wearing a body recorder. During the trip, McAvoy, Melton and Friedman specifically discussed the reputation of the principals as dangerous, violent people.

At about this time, Mr. Friedman specifically discussed with FBI Special Agent McAvoy his concerns that his safety and that of his children might be jeopardized. McAvoy on behalf of the FBI told him that the FBI would protect him in the event there was a threat. In such event, the FBI would do whatever was necessary.

During 1979, Friedman, acting for the FBI, covertly tape recorded many conversations with persons associated with the nude night club and disco industry who were suspected of violations of the law. Typically, Agent McAvoy and Mr. Friedman would agree in advance that no attorney-client relationship between Mr. Friedman and any client would be violated by the planned activity.

In August of 1979, Mr. Friedman covertly recorded a conversation between himself, John Collicott, and Carl Coppola. Collicott was under investigation at that time. In the course of that conversation, Mr. Coppola made a comment reflecting that he had an interest in the She Club. In response, Mr. Friedman said "... I'm always the last to know who owns what." During the conversation, Coppola freely discussed a pending criminal matter in Florida in which he was the defendant. He and Friedman discussed the possibility of bribing public officials in connection with that matter and another case. The tape was turned over to the FBI and transcribed.

In the fall of 1979, the FBI confronted John Collicott with the evidence it had against him. Collicott agreed to act as an informant for the FBI. At this point the FBI decided to stop using Mr. Friedman's undercover assistance. The record does not reflect that the FBI formally told Friedman his services would no longer be needed; however, he was never asked by the FBI to do undercover work again. Nonetheless, Mr. Friedman continued a social relationship with Agent McAvoy. They saw each other regularly and doubledated. McAvoy was best man in Friedman's wedding in 1981. The two men frequently discussed law enforcement matters. Friedman volunteered information and ideas to McAvoy which he thought the

FBI would be interested in. Some information and ideas were valuable.

In December of 1979, Mr. Friedman was contacted by a Mr. Weiss, who had been sentenced on a felony conviction in federal court. Weiss stated he had information that Roscoe Dean, a member of the Georgia legislature, was involved in a plot to kill Governor George Busbee. Weiss offered to make his information available if the prosecutor would bring his cooperation to the attention of the sentencing judge. Friedman contacted the prosecutor. Weiss's information was conveyed to the Georgia Bureau of Investigation ("GBI") and as a consequence, the GBI asked Friedman to do undercover work on the investigation of Roscoe Dean. In January, 1980, Mr. Friedman wore a concealed body recorder and, posing as a drug smuggler, discussed the possible sale of cocaine with Mr. Dean. Mr. Friedman then arrested him. The arrest and Friedman's dual role as attorney and law enforcement consultant/undercover investigator received wide attention in the media.

In January 1980, Mr. Friedman became concerned that the publicity about his law enforcement activities might cause Carl Coppola to feel threatened. Friedman feared violent retaliation, as Coppola had a reputation for violence. He and either Detective Melton or Agent McAvoy arranged for Tony Romano, a client of Friedman's who owned "bath houses," to speak to Coppola to assure him that Friedman was not investigating him. Romano reported back to them that he had spoken with Coppola and everything was all right.

In March of 1980, a person identified as "the female source"[2] reported to Detective Melton that she had overheard a statement made by John Fisher, step-father of Carl Coppola. Fisher had said that a stack of newspaper articles concerning the Roscoe Dean trial should not be thrown away. Fisher said that if Friedman ever tried to come after them, they would get him first. Melton related this to Agent McAvoy, but

not to Friedman. McAvoy did not report it to Friedman either.

In the summer of 1980, Mr. Friedman did undercover work for the GBI on a case involving an attempt to bribe someone in the Clayton County District Attorney's Office. The defendant was a lawyer for whom Friedman had once worked. Friedman testified at the trial in 1981, which resulted in a conviction. This case also received considerable publicity. The FBI supplied surveillance equipment for this investigation, but otherwise did not participate.

In 1982, Mr. Friedman introduced "Emory,"[3] an underworld figure, to Agent McAvoy. As a result, Emory was enlisted as a paid informant for the FBI.

In the spring of 1982, Mr. Friedman announced his candidacy for Solicitor General of Fulton County. His campaign emphasized his connections with law enforcement and specifically his participation in bringing organized crime figures and corrupt public officials to justice. His campaign brochure said:

In 1979, Hirsch Friedman was appointed as the first special consultant on organized crime and political corruption to the Georgia Bureau of Investigation. In this position, he worked closely with the Federal Bureau of Investigation, as well as state and local law enforcement agencies, in bringing organized crime figures and corrupt public officials to justice.

The brochure also said:

As an extension of his role as an officer of the court, Mr. Friedman has conducted several undercover investigations for national, state, and local law enforcement agencies into organized crime and political corruption.

In mid-July, 1982, Mr. Friedman introduced FBI Special Agent McAvoy to "the female source." She was the person who had told Detective Melton in 1980 about the comment made by Carl Coppola's step-father. The female source was a social friend of both Mr. Friedman and his wife,

---

**2.** The parties agreed to use this designation in lieu of the individual's real name.

**3.** Emory is an agreed-upon code name.

Beth. She worked in Mr. Friedman's campaign in the spring and summer of 1982. Mr. McAvoy dated the female source many times during late July and early August.[4] During this time the two of them socialized with the Friedmans.

While she was dating Special Agent McAvoy, the female source also had a social relationship with Richard T., who she identified as the manager of a "stress clinic" located in the same building as Mr. Friedman's law office.[5] The record contains no precise testimony as to the services offered by the stress clinic. However, the female source visited Richard there and evidently believed it was a front for the distribution of illegal drugs. She called Detective Melton and told him that. She also said she had seen people there who were Coppola associates. She said she felt the clinic was a Coppola operation.

The female source also told Detective Melton she had discussed her concerns about the stress clinic with Agent McAvoy and also with Mr. Friedman. Melton did not spell out exactly what she said she had told Friedman and McAvoy. The court infers that the female source likely gave approximately the same information to Mr. Friedman and Agent McAvoy as she gave to Detective Melton concerning the stress clinic. She had a close relationship with each of them, knew they were friends, and viewed them as sharing the same interests. She was dating Agent McAvoy; she was working in Mr. Friedman's campaign and had known him socially for a couple of years; and she had been providing information to Detective Melton since at least the beginning of 1980. Therefore, Mr. Friedman knew of her theory that the clinic was a Coppola operation.

On or about July 29, 1982, Mr. Friedman made an investigatory visit to the stress clinic. He sought to engage the "manager," Richard, in discussion of illegal drugs. Richard quickly replied that Friedman might as well stop because he was well

aware of who Friedman was and what he was doing. The female source was present during this visit by Mr. Friedman.

The female source called Detective Melton and told him about Friedman's visit to the clinic. She reminded Melton of the 1980 comment made by Carl Coppola's step-father John Fisher, and opined that Coppola now would think Friedman was coming after him, since the clinic was a Coppola operation.

The female source also told Detective Melton in the same call that Mr. Friedman was planning to appear on a radio question and answer session for the candidates for Solicitor General, and that he was going to make some specific comments about criminal activity in the area in Atlanta where nude entertainment clubs are concentrated. Although he did not plan to name any names, she thought specific individuals, apparently including Carl Coppola would feel singled out and threatened. She opined that Friedman was going to get killed. Detective Melton discussed the gist of this conversation with Agent McAvoy.

This telephone call from the female source to Detective Melton did not trigger a warning by either Detective Melton or Agent McAvoy to Mr. Friedman concerning the stress clinic. Neither did they mention to him the 1980 comment by John Fisher. However, Agent Mr. McAvoy met with Mr. Friedman and warned him not to be too specific in his comments during the radio broadcast.

On August 17, 1982, Mr. Friedman's car, which was parked in front of his residence, blew up when he started it. One of Mr. Friedman's legs was severed at the knee; he sustained other bodily injuries from the shrapnel. The explosion damaged Mr. Friedman's residence as well as his car. His son Darin sustained minor injuries to his feet from the glass particles on the floor of the house.

4. The relationship ended abruptly when Agent McAvoy learned that she either was or had been a paid informant for the FBI.

5. The female source did not testify at trial, either in person or by deposition. Virtually all of the testimony concerning her statements was given by Detective Melton. There were no hearsay objections.

The parties have entered into a stipulation concerning the identity of the person who they believe planted the bomb. That stipulation is as follows:

"STIPULATION AS TO EVIDENCE

"On July 28, 1981, David Neil Bennett was arrested for aggravated assault. The assault resulted from an incident which took place when Mr. Bennett was attempting to serve a warrant for Chamblee Bonding Company in a bond forfeiture case. Mr. Bennett hired Mr. Friedman to represent him. After a mistrial, he was eventually convicted in a jury trial on February 4, 1982, of the reduced charge of simple assault and sentenced to 12 months.

"Mr. Friedman filed a motion for a new trial, following the trial. Mr. Bennett was told that a transcript would be necessary to perfect his rights to a new trial or appeal. Several payments were made on the transcript, the last of which occurred within a few weeks of the date of the bombing and also after the bombing.

"In March 1982 Bennett obtained a passport. Before August 1982, he made calls to the Visa Department of more than one foreign embassy. On June 17, he put a 357 magnum on layaway and began making small payments on it. On August 8, 1982, later in the day on which Mary Welcome had participated in a radio forum with Mr. Friedman, relating to their competing, upcoming candidacy for Fulton County Solicitor, Ms. Welcome had a call from a person she claimed to be unknown, who said, essentially, 'He should not have said those things about you. Don't worry about Hirsch Friedman. He won't be around in November.'

"On August 13, 1982, David Moore saw an individual he has positively identified as David Neil Bennett on a ridge that overlooks Hirsch Friedman's office. Mr. Moore recognized Mr. Bennett from television and later picked him out from photographs of different persons shown to him by persons investigating the bombing.

"Ms. Welcome tape recorded a phone conversation she had with Mr. Bennett on September 2, 1982. She said that Bennett told her that he recognized her as the attorney for Wayne Williams and also stated he knew her from having worked security at a Bank of the South Building where he said he had spoken to her before as she signed in or out.

"Ms. Welcome told investigating agents that she recognized his voice as that of the unidentified man who had called her before.

"Sometime before August, 1982, Mr. Bennett had asked his roommate if he knew someone who would want to buy some blasting caps or knew anyone who had caps for sale.

"In mid-August, 1982, Mr. Lynn Jillson, who lived near Mr. Friedman, found on her lawn or driveway an envelope and business card. The envelope was addressed to Mr. Bennett's roommate and there was a hand-drawn map with directions to Mr. Friedman's house on the back side of the envelope. The business card was for the Bill Bennett Company with Mr. Friedman's address on the back. Ms. Jillson took the envelope and business card and left it on the door of Mr. Friedman's house. After a few days, Mrs. Friedman threw it away but she and investigators retrieved it after the bombing.

"On the day of the explosion, among other evidence at the scene, was a homemade mercury switch which was used to trigger the explosion.

"Mr. Bennett's roommate was questioned on September 1, 1982. He said he knew nothing about the envelope and card but thought the handwriting was his roommate's. In his initial interview on that same date, Mr. Bennett would neither confirm or deny drawing the map or anything else.

"There is no evidence that Mr. Bennett had formal training in explosives, but has been interested in them since high school when he attempted to blow up a school commode. During this same time period another device was found at the school and was described as an explosive material wrapped in aluminum foil then wrapped in soldering wire. A girl he knew stated that

he had told her he and Mary Welcome were real tight and that Mary Welcome had helped him in several cases. Mr. Bennett has a very explosive nature and many people associated with him in the past can testify to this.

"As an example of his explosive personality, a former supervisor at a security firm, patroling parking lots reported that Bennett pulled a gun on a co-employee in a parking lot and threatened to kill him. Another incident involved a co-employee who made a complaint. After the complaint was made, hate notes appeared on the doors of the parking lot at the Atlanta center. These notes appeared to be aimed at the employee and his supervisor. They said, 'You're going to die. Be glad you're not on my shift. Finks suck.'

"Mr. Bennett was seen at Northside Hospital after Mr. Friedman was taken there.

"On September 10, 1982, a search warrant was executed at Bennett's apartment. Items found included: an Atlanta Journal Newspaper dated August 17, 1982, articles from the Atlanta Journal Newspaper dated June 9, 1982, on instruction booklet on the 'Safe Use and Handling of Explosives;' an envelope from Friedman, Shopsin and Woodland, PC, which contained a letter and bill of sale for a vehicle, a map to Mr. Friedman's residence had been drawn on the back of the bill of sale; hobby fuse and cannon fuse were found; soft drink cans wrapped in wire were found.

"No emotion was shown by Bennett during the search except to complaint to investigators that Mary Welcome was being harrassed and that the investigators had no right to do that.

"On September 9, 1982, a friend of Mr. Bennett's taped a phone conversation in which Mr. Friedman was discussed. In it among other things, Mr. Bennett mentioned his phone call from Mary Welcome, mentioned he would have to find another parttime job, and move into a cheap hotel until he saved enough money, explained how a mercury switch worked, call Mr. Friedman a snitch, talked about Mr. Friedman and his condition, mentioned Mr.

Friedman was hospitalized at Northside Hospital where Mr. Bennett had worked.

'If somebody paid money to have him killed, he is still alive. They are going to have to do it again to finish it up; that's the way it works. He's like a dead man where he's at now.'

"The Fulton County PD was the originating police authority in this investigation. However, many agencies, including federal agencies, had members on the Task Force which investigated the bombing. At the conclusion of the investigation, the case was presented to District Attorney Lewis Slaton for prosecution. He declined. Mr. Fernander, who was possibly the closest friend David Neil Bennett had, had originally given a statement incriminating Mr. Bennett. Fernander later recanted most of the incriminating statements. He was thought to be a weak witness. Evidently, without him, the District Attorney felt prosecution would not be successful. However, he was the prime suspect and, more likely than not, responsible for placing the bomb.

/s/ _____
PHILLIP A. MONTALVO
For Plaintiffs
/s/ _____
NINA L. HUNT
For Defendant"

Plaintiffs' theory is that David Neal Bennett planted the bomb on behalf of and at the direction of Carl Coppola. They reason that someone reported to Coppola that Friedman was investigating the stress clinic, which they assert belonged to Coppola. At this point, Coppola determined that Friedman in fact was out to get him and decided to make good on the 1980 threat. Plaintiff argues that if he had known of the 1980 threat, he would not have gone to the stress clinic. He also appears to argue that once the FBI, through Special Agent McAvoy, found out he had gone to the stress clinic, they had an obligation to provide him and his family with physical protection from retaliation by Coppola.

There was no direct evidence that anyone told Carl Coppola that Hirsch Friedman had visited the stress clinic or was investi-

gating it. The only evidence that the clinic was a Coppola front was provided by Detective Melton, which testimony consisted of his relating what the female source had said to him. He related her statements to the best of his recollection. He testified she had opined that the clinic was a Coppola front. He further testified, however, that she had identified by name the persons she had seen there; they were owners of nightclubs other than The She. Detective Melton was unable to find corroborating evidence that the stress clinic was a Coppola front. There was no evidence that the female source had said that Richard T, the stress clinic manager, was a Coppola associate.

Likewise, there was no direct evidence that Carl Coppola caused David Neal Bennett to plant the bomb in Hirsch Friedman's car.

Plaintiffs sought to prove that Bennett acted on Coppola's behalf in planting the bomb by showing that Bennett was an employee of Coppola's and that Coppola had conspired to kill others with car bombs. In *United States v. Coppola*, Criminal No. 86–185A (N.D.Ga., 1986–87), Coppola was convicted on charges of criminal racketeering. The government introduced evidence at Coppola's trial seeking to prove that he had conspired to have one or more individuals killed with bombs. However, there is no evidence before the court that the conviction was based on the evidence concerning the alleged bomb plot.

On numerous occasions in 1979 and 1980, David Neal Bennett was seen in the company of Carl Coppola at Jilly's, Coppola's restaurant. Two policemen testified credibly that they had observed Bennett and Coppola talking to each other on certain occasions, but they had not heard what they were saying. Ronald Zappi testified credibly that he had seen Bennett at Jilly's at a meeting attended by Coppola. Michael Gross, Zappi's previous attorney, testified credibly that he had returned telephone calls to Bennett at Jilly's. Tony Romano's testimony that Bennett parked his car on orders from Coppola is discredited. Also, Ronald Zappi's testimony that he saw Bennett operating the cash register at Jilly's is discredited.

It is undisputed that David Neal Bennett was a client of Hirsch Friedman's. Friedman had represented him in a criminal matter in which he had been convicted about six months before the bombing. At the time of the bombing, the matter was on appeal and Bennett was out on bond. There is no evidence of substance to prove the government's contention that Bennett was mad at Friedman because the trial transcript cost too much.

*Galanti v. United States,* 709 F.2d 706 (11th Cir.1983) sets forth the applicable law. In *Galanti,* the Court recognized that in Georgia there is no general duty to warn or protect another person from a foreseeable risk of harm simply because one has knowledge of the danger, *citing Bradley Center, Inc. v. Wessner,* 250 Ga. 199, 296 S.E.2d 693 (1982) and *Thomas v. Williams,* 105 Ga.App. 321, 124 S.E.2d 409 (1962). However, *Galanti* recognizes that in two situations potentially applicable to the instant case, a duty to warn or protect may arise. The first is where law enforcement officials have voluntarily established a special relationship with a person who is assisting them in an investigation, *citing Swanner v. United States,* 275 F.Supp. 1007 (M.D.Ala.1967), and *Miller v. United States,* 561 F.Supp. 1129 (E.D.Pa.1983). The second is where the law enforcement officials' own actions affirmatively create the danger, and they fail to warn or protect the person who is thereby endangered, *citing United States v. Aretz,* 248 Ga. 19, 280 S.E.2d 345 (1981); *Hardy v. Brooks,* 103 Ga.App. 124, 118 S.E.2d 492 (1961).

A special relationship between Mr. Friedman and the FBI did exist when he was doing undercover work in 1979. At the end of 1979, this relationship concluded. Mr. Friedman's relationship with the FBI thereafter was sporadic and tangential to work he was doing for the GBI. Additionally, after 1979, Mr. Friedman's relationship with Special Agent John McAvoy was primarily a personal relationship, not a business relationship.

■ Under *Galanti*, the FBI had a duty of care toward Mr. Friedman with respect to foreseeable risks associated with authorized undercover activity.[6] However, the FBI had no duty to protect Mr. Friedman from the general risk that a client who felt threatened or angry about Friedman's law enforcement ties might seek revenge. This general risk was assumed by Mr. Friedman, as it was primarily a function of Mr. Friedman's relationship with his clients, not his relationship with the FBI.

Applying the foregoing general principles to the facts of this case is difficult because neither Mr. Friedman nor the FBI claims he was asked to investigate Coppola. Neither side has sought to prove or disprove whether, when Mr. Friedman undertook to tape record his conversation with John Collicott, it was understood or foreseen that he would simultaneously tape record Mr. Coppola.

■ The court need not resolve this issue in order to determine whether the FBI's failure to tell Mr. Friedman of the 1980 comment made by John Fisher constituted a breach of its duty. This comment, which was to the effect that if Friedman ever came after Coppola, Fisher and Coppola would get him first, was not a specific threat and conveyed no information that Mr. Friedman did not already know. He believed Mr. Coppola was a violent person, who would be furious if he thought his lawyer had been double dealing him. The fact that Mr. Friedman took the unusual step of sending Tony Romano, another client, to assure Coppola that he was not out to get him, reflects Mr. Friedman's awareness of the threat he would face if Coppola thought Friedman was investigating him. There is no duty to warn of that which is as obvious to the Plaintiff as it is to the Defendant. *Apostol–Athanasiou v. White*, 176 Ga.App. 178, 179, 335 S.E.2d 442 (1985).

The FBI had no duty to Mr. Friedman in connection with the stress clinic visit because there was no special relationship between them at that time. Neither does the record reflect that the FBI's own actions created a risk to Mr. Friedman or augmented a risk otherwise existing.

The FBI did not authorize Mr. Friedman to visit the stress clinic. Neither could Mr. Friedman have reasonably thought he was acting for the FBI. He probably did discuss the clinic with Special Agent McAvoy; McAvoy may have known of Friedman's plans. However, this was in the context of a personal relationship wherein Agent McAvoy did not purport to speak for the FBI. Agent McAvoy had been reassigned by then from the Organized Crime Squad to another unit; the investigation previously handled by McAvoy, which Friedman had worked on, had been reassigned to another FBI agent. Mr. Friedman had insufficient reason to believe that he was investigating the clinic for the FBI, and indeed, he was not.

The FBI's failure to tell Mr. Friedman in the summer of 1982 about the 1980 comment of John Fisher did not augment any risk the clinic otherwise posed to Friedman. The female source had told Mr. Friedman she thought it was a Coppola front; as mentioned previously, Mr. Friedman was aware of the threat of violence if Coppola decided Friedman was investigating him.

■ In addition to the absence of the element of breach of duty, there is also a failure of proof linking the car bombing to Coppola. There is no direct evidence that Coppola knew Friedman had been to the stress clinic. There is insufficient evidence to support an inference that Friedman's visit to the stress clinic was likely reported back to Coppola. The fact that associates of Coppola were seen at the stress clinic does not necessarily lead to the conclusion that it was a Coppola "front." The persons the female source saw could just as well have been visitors who had no likely basis for knowing that Friedman also had visited there. They were not employees of Coppo-

---

**6.** This duty did not automatically end when the official relationship ended. For example, if a person who Mr. Friedman had investigated for the FBI in 1979 threatened to kill him in retalia-
tion in 1980, and the FBI knew it and Mr. Friedman did not, the FBI would have had a duty to warn or protect Mr. Friedman.

la, but rather associates who may have been only social acquaintances. There was no evidence that Richard T, the "manager" of the clinic, worked for Coppola.

There is insufficient evidence to prove that Coppola hired Bennett to bomb the car. There is enough evidence to persuade the court that Bennett and Coppola knew each other and had some affiliation in 1979 and 1980. However, there is no evidence of the extent of their relationship, if any, during the year before or after the car bombing incident. The court therefore cannot infer that Bennett acted on behalf of Coppola.

In summary, the court finds and concludes that the United States breached no duty to the Plaintiff Hirsch Friedman; further, the evidence fails to prove that the FBI's failure to warn Mr. Friedman of the 1980 statement by John Fisher was causally related to the injuries Mr. Friedman received in the car bombing in 1982. This determination requires that judgment be entered in favor of the Defendant with respect to all claims asserted by Plaintiffs Hirsch Friedman, Jane Elizabeth Friedman and Darin Friedman.