Cheryl Ann **PIECHOWICZ, Individually and as Personal Representative of the Estate of David Scott Piechowicz, Sherrie Marie Waldrup, a Minor by Cheryl Ann Piechowicz, her Mother and Next Friend, John I. Kennedy, Jr., Individually and as Personal Representative of the Estate of Susan C. Kennedy, Melva Kennedy, "To the use of Walter Piechowicz", "to the use of Florence Piechowicz", "to the use of Reliance Insurance Co."**

**v.**

**UNITED STATES of America, James Savage, individually and as Assistant United States Attorney for the District of Maryland, John Ryan, individually and as an Agent of the Drug Enforcement Administration of the United States.**

**Civ. No. K–86–802.**

United States District Court, D. Maryland.

March 29, 1988.

Stephen N. Goldberg and George R. Hoffman, Baltimore, Md., for plaintiffs other than Use–Plaintiff Reliance Ins. Co.

Donald L. Allewalt, Baltimore, Md., for Use–Plaintiff Reliance Ins. Co.

Richard K. Willard, Asst. Atty. Gen., Washington, D.C., John J. Farley, III, Director, Gordon W. Daiger, Sr. Trial Coun-

sel, and Burke M. Wong, Trial Atty., Torts Branch, U.S. Dept. of Justice, Washington, D.C., Breckinridge L. Willcox, U.S. Atty., and Juliet A. Eurich, Asst. U.S. Atty., Baltimore, Md., for defendants.

FRANK A. KAUFMAN, Senior District Judge:

On April 28, 1983, David Scott Piechowicz and Susan C. Kennedy were murdered at the Warren House Hotel in Baltimore County, Maryland. In this case, their survivors bring suit against the United States of America, Assistant United States Attorney James C. Savage (Savage), and Special Agent John Ryan (Ryan) of the Drug Enforcement Administration (DEA). Defendants have moved to dismiss the plaintiffs' claims against them on various grounds.[1]

## I. Facts

Anthony Grandison was charged with violations of federal drug and firearms laws in an indictment filed in this Court on November 17, 1982.[2] Assistant United States Attorney Savage and Special Agent Ryan were in charge of the prosecution of the case. David Scott Piechowicz (David) and Cheryl Ann Piechowicz (Cheryl), husband and wife (collectively, the Piechowiczes), were subpoenaed by the government to testify in that case against Grandison during a pretrial hearing on March 14, 1983 as well as at the trial on May 3, 1983. Plaintiffs allege that both David and Cheryl were threatened by an agent of Grandison on March 14, 1983, before the hearing on that date; that David and Cheryl immediately reported those threats to Savage and Ryan; and that David and Cheryl were told by Savage and Ryan not to worry about the threats and to testify truthfully and honestly when called to testify at the March 14, 1983 hearing.

During the hearing, both David and Cheryl testified against Grandison, disclosing during their testimony that they were both then working at the Warren House Hotel in Baltimore County, Maryland. Plaintiffs also assert that Cheryl and David repeated their concerns about the threats to Savage and Ryan on several occasions after the March 14th hearing, but that no action by anyone connected with the government was taken to protect David or Cheryl with respect to any danger in connection with their testifying against Grandison. Plaintiffs further claim that Savage and Ryan knew or should have known that Grandison had threatened harm to a witness involved in an earlier criminal prosecution of Grandison and, in fact, had subsequently harmed that witness.[3] Plaintiffs do not claim that Cheryl or David ever requested protection, nor do they assert that the government

1. The individual defendants have filed motions to dismiss, and the United States has filed a motion for summary judgment. On January 12, 1987, this Court granted the motions to dismiss of defendants Savage and Ryan, held *sub curia* the claims against the United States, and subsequently scheduled further briefing and a hearing with regard to the claims against the United States. In this opinion, this Court reviews and rules with regard to all of plaintiffs' claims.

  Shortly after this case was initiated, plaintiffs moved to disqualify all judges of this Court on the grounds that their impartiality was open to question because of the positions occupied by the individual defendants, particularly defendant Savage, who, as Assistant United States Attorney from November 28, 1982 to July 28, 1987, appeared often in this Court. The undersigned Judge of this Court denied that motion, concluding that "neither justice nor any appearance of justice" required disqualification. *See* Memorandum and Order dated July 21, 1986, Paper No. 11 in the court file. In this instance, the undersigned Judge of this Court neither had nor has any relationship with either individual defendant which might cause "a reasonable member of the public at large, aware of all the facts, [to] fairly question the Court's impartiality." *United States v. Ferguson,* 550 F.Supp. 1256, 1260 (S.D.N.Y.1982) (Weinfeld, J.); *see also SCA Services, Inc. v. Morgan,* 557 F.2d 110 (7th Cir.1977). Furthermore, in the course of reexamining its said July 21, 1986 determination before finalizing this opinion, this Court notes that this written opinion assumes as true all relevant and material facts alleged or proffered by plaintiffs. This opinion assumes, *arquendo* only, that the alleged failure of the individual defendants to provide, or to offer to provide, protection to the Piechowiczes constituted an abuse of discretion, and thus its holdings rest solely upon legal, as opposed to factual, grounds.

2. *United States v. Grandison,* Crim. No. JH–82–00501.

3. That earlier case was *United States v. Grandison,* Crim. No. M–79–0161.

offered to provide the Piechowiczes with the same.

On April 28, 1983, David and Susan C. Kennedy (Susan) were "gunned down gangland style"[4] by an agent of Grandison while David and Susan were working at the reception desk of the Warren House Hotel. Subsequently, in a second criminal case brought in this Court[5] Grandison and others were convicted for those murders. The evidence in that later criminal case indicated that David had been murdered to prevent him from testifying against Grandison at the scheduled May 3, 1983 trial, and that Susan was murdered in the mistaken belief that she was Cheryl.

On March 13, 1986, in this civil case, a twelve-count complaint was filed by surviving family members of the two victims, namely Cheryl Piechowicz,[6] Sherrie Marie Waldrup (Sherrie),[7] John I. Kennedy, Jr. (John),[8] and Melva Kennedy (Melva),[9] against the United States and also against Savage and Ryan in their individual capacities.[10] Six counts are brought against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671–80. The other six counts are brought against the two individual defendants, Savage and Ryan, for violation of plaintiffs' constitutional rights under 42 U.S.C. § 1983.

## II. *The Individual Defendants and Harlow Immunity*

Plaintiffs claim against defendants Savage and Ryan in their individual capacities, contending that defendants violated plaintiffs' Fifth Amendment rights by causing the deaths of David and Susan in violation of their constitutional rights to due process of law. Specifically, plaintiffs assert that

Savage and Ryan had a duty to warn David and Susan of the danger of testifying against Grandison and/or to protect them from being harmed by Grandison. Savage and Ryan have moved for dismissal of the complaint against them in their individual capacities on the basis of absolute immunity, and, in the alternative, on the basis of qualified immunity pursuant to *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

■ Savage may not be entitled to absolute immunity because the actions he took in deciding whether or not to warn and/or to protect decedents may not have been made by him solely as an advocate. *See Harlow*, 457 U.S. at 811 n. 16, 102 S.Ct. at 2734 n. 16; *Gray v. Bell*, 712 F.2d 490, 499–502 (D.C.Cir.1983), *cert. denied*, 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984). However, regardless of whether Savage is entitled to absolute immunity, he is entitled in this case to the protection afforded by qualified immunity. *See Harlow*, 457 U.S. at 807–815, 102 S.Ct. at 2732–2737. Similarly, a DEA agent such as Ryan is entitled as a law enforcement official to invoke the doctrine of qualified immunity if the record in this case so permits. *Hughes v. Blankenship*, 672 F.2d 403, 406 (4th Cir.1982).

In *Harlow*, Justice Powell wrote that a claim of qualified immunity rests upon the existence, if any, of the "objective reasonableness of an official's conduct, as measured by reference to clearly established law." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738 (footnote omitted). The reason for the doctrine is that "where an official's duties legitimately require action in which

---

**4.** *See* "Statement of Facts of the Offense," set forth in Memorandum to U.S. Probation Department from James C. Savage, relating to the then-upcoming sentencing of Grandison, at p. 5 (attached as Ex. F to plaintiffs' Response to Defendant's Motion for Summary Judgment).

**5.** *United States v. Grandison*, Crim. No. HM–83–0200.

**6.** Individually, and as personal representative of the estate of her deceased husband, David.

**7.** Sherrie, a minor, is the daughter of David and Cheryl Piechowicz. The suit is brought on her behalf by Cheryl, her mother and next friend.

**8.** Individually, and as personal representative of the estate of Susan, his daughter.

**9.** Mother of Susan.

**10.** One use-plaintiff, an insurance company, is also involved in this case. However, due to the disposition discussed in this opinion, certain subrogation issues concerning the use-plaintiff's claims need not and will not be reached.

clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences.' " *Id.* at 819, 102 S.Ct. at 2739 (quoting *Pierson v. Ray*, 386 U.S. 547, 554, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967)).

In *Mitchell v. Forsythe*, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), Justice White cautioned:

Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.

472 U.S. at 526, 105 S.Ct. at 2816. Under that test, the law must be clearly established "at the time of the [official's] challenged actions." *Id.* at 528, 105 S.Ct. at 2816–17. In the instant case, the relevant time frame encompasses the period from March 14, 1983, when Savage and Ryan first became aware of Grandison's threats against the Piechowiczes, until April 28, 1983, when David and Susan were murdered.

The focus of this Court's inquiry therefore becomes whether, during the relevant time frame, the decedents had a clearly established constitutional right to be protected from harm by the government. In *Martinez v. California*, 444 U.S. 277, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980), the Supreme Court first considered the possibility that a state may be liable for failing to protect a person from harm caused by a non-state actor. In that case, plaintiffs, proceeding under 42 U.S.C. § 1983, brought suit against California parole officials who seemingly had failed to follow state parole procedures with regard to an individual (one Thomas) who later killed Ms. Martinez. Plaintiffs claimed that the parole officials' actions deprived the decedent of her life without due process because the officials "knew, or should have known, that the release of [the paroled prisoner] created a clear and present dan-

ger that such an incident would occur." 444 U.S. at 280, 100 S.Ct. at 556. Writing for a unanimous Court, Justice Brennan affirmed the denial by the California state courts of plaintiffs' quest for relief and wrote, *inter alia:*

Although the decision to release Thomas [the paroled prisoner] was action by the State, the action of Thomas five months later cannot be fairly characterized as state action. Regardless of whether, as a matter of state tort law, the parole board could be said either to have had a "duty" to avoid harm to his victim or to have proximately caused her death ... we hold that, taking these particular allegations as true, appellees did not "deprive" appellants' decedent of life within the meaning of the Fourteenth Amendment.

... [T]he parole board was not aware that appellants' decedent, *as distinguished from the public at large*, faced any special danger. *We need not and do not decide that a parole officer could never be deemed to "deprive" someone of life by action taken in connection with the release of a prisoner on parole.*

*Id.* at 284–85, 100 S.Ct. at 559 (emphasis added; citations and footnote omitted).

The Supreme Court thus left open in *Martinez* the circumstances under which persons "distinguished from the public at large, [because they] faced any special danger" might recover for a deprivation of their rights under the Fourteenth Amendment if the state failed to protect them from harm.[11]

The Fourth Circuit first addressed the issue *Martinez* left open in *Fox v. Custis*, 712 F.2d 84 (4th Cir.1983). Plaintiffs in *Fox* sued employees of Virginia's Department of Corrections, Division of Probation and Parole Services, under 42 U.S.C. § 1983. Plaintiffs had been injured by a paroled prisoner who was under defend-

---

11. Because the instant action is against federal officials, it is brought pursuant to the due process clause of the Fifth Amendment. However, the due process analysis under the Fifth Amendment seemingly does not materially differ from the corresponding analysis under the Fourteenth Amendment. *See Paul v. Davis*, 424 U.S. 693, 702 n. 3, 96 S.Ct. 1155, 1161, n. 3, 47 L.Ed.2d 405 (1976).

ants' supervision, and who was in violation of his parole at and before the time he injured plaintiffs. Defendants knew of the parole violations and also suspected the parolee of committing arson while on parole. Despite that knowledge, defendants did not recommend that his parole be revoked. Thereafter, the parolee set fire to plaintiff Fox's house, raped, beat, and set on fire plaintiff Lisa Morris, and shot and stabbed plaintiff Wendy Morris.

Plaintiffs in *Fox* claimed that defendants' failure to revoke the offender's parole status, which thereby allowed the offender to remain free and to injure the plaintiffs, deprived them of due process of law. In affirming the district court's dismissal of the plaintiffs' section 1983 claims, Judge Phillips analyzed a state's post-*Martinez* duty to protect a person from harm at the hands of a non-state actor, and noted that "in general, there simply is 'no constitutional right to be protected by the state against ... criminals or madmen,' " and that, therefore, the state had no corollary duty to provide such protection. 712 F.2d at 88 (quoting *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir.1982)). However, Judge Phillips recognized one exception to the general rule; namely, that

> such a right and corollary duty *may* arise out of special custodial or other relationships created or assumed by the state in respect of particular persons. For example—as we have held in this circuit—such a right/duty relationship may arise under § 1983 with respect to inmates in the state's prisons or patients in its mental institutions whom the state knows to be under specific risk of harm from themselves or others in the state's custody or subject to its effective control....

> Without attempting a general definition of the special relationship required to give rise to a right, vindicable under § 1983, to affirmative protection by the state, it suffices to observe that none is claimed or appears here. The claimants here were simply members of the gener-

al public, living in the free society, and having no special custodial or other relationship with the state. As in *Martinez*, ... the state agent defendants here were "unaware that the [claimants] as distinguished from the public at large faced any special danger." *Martinez*, 444 U.S. at 285, 100 S.Ct. at 559 [.]

*Id.* (emphasis in original; citations and footnote omitted).

Thus, while in *Fox* the Fourth Circuit recognized that such a right to protection might exist under certain circumstances, it specifically declined to attempt to define the special relationship required to create that right. However, subsequently in *Jensen v. Conrad*, 747 F.2d 185 (4th Cir.1985), *cert. denied*, 470 U.S. 1052, 105 S.Ct. 1754, 84 L.Ed.2d 818 (1986), the Fourth Circuit provided guidance about the factors applicable to a determination of whether a special relationship exists between the state and a victim of a crime.

In *Jensen*, the plaintiffs in a section 1983 suit alleged that the failure of the South Carolina Department of Social Services to protect the decedents from the child abuse which led to their deaths constituted a deprivation of due process.[12] Plaintiffs argued that a comprehensive South Carolina statutory scheme for the protection of children from abuse created a special relationship which entitled the deceased children to the affirmative protection of the state. In the light of *Fox*, the Fourth Circuit rejected plaintiffs' position and affirmed the district courts' grant of summary judgment to defendants on the basis of their qualified good faith immunity claims under *Harlow*. In so doing, Judge Ervin pointed out that the *Jensen* decedents had died before an affirmative duty of protection had clearly emerged in the case law, and that the defendants could not have been expected to anticipate either the views expressed by Judge Phillips in *Fox* or that a special relationship existed. 747 F.2d at 194. Judge Ervin listed "some of the factors that should be included in a 'special relationship' analysis":

---

12. *Jensen* was a consolidated appeal of two cases in which the district courts had dismissed the claims against the defendants on the basis of qualified immunity.

1) Whether the victim or the perpetrator was in legal custody at the time of the incident, or had been in legal custody prior to the incident[;] ...

2) Whether the state has expressly stated its desire to provide affirmative protection to a particular class or specific individuals[;] ... [and]

3) Whether the [s]tate knew of the claimants' plight.

*Id.* at 194–95 n. 11.

In the case at bar, the government had no special relationship with Susan. She was the uninvolved, innocent bystander. *See Galanti v. United States,* 709 F.2d 706, 710 (11th Cir.1983), *cert. denied,* 465 U.S. 1024, 104 S.Ct. 1279, 79 L.Ed.2d 683 (1984); *Miller v. United States,* 561 F.Supp. 1129, 1137–39 (E.D.Pa.1983), *aff'd mem.,* 729 F.2d 1448 (3rd Cir.1984). On the other hand, the government did have a special relationship with the other decedent, David. But it is important to note the state of the law with regard to special relationships at the time of the murders: *Fox* was decided nearly three months after David and Susan were murdered, and *Jensen* about seventeen months thereafter. Thus, as of March and April 1983, the relevant time frame herein, the precise contours of a special relationship which gives rise to an affirmative right to protection by the state were not clearly established by governing case law. *See Jensen,* 747 F.2d at 194–95.

Case law is not, however, the sole source of clearly established law. Alleged violations of clearly established statutory rights may also bar a defense of qualified immunity. *See Davis v. Scherer,* 468 U.S. 183, 193–94 & n. 12, 104 S.Ct. 3012, 3019 & n. 12, 82 L.Ed.2d 139 (1984). Plaintiffs rely upon the congressional Objectives estab-

lished in the Federal Guidelines for Treatment of Crime Victims and Witnesses in the Criminal Justice System (the Objectives), Pub.L. 97–291, 96 Stat. 1256–57 (codified at 18 U.S.C. § 1512 note), contending that those Objectives represent such a clearly established statutory right.[13]

Section (a)(2) of the Objectives states:

(2) **Notification of availability of protection.**—A victim or witness should routinely receive information on steps that law enforcement officers and attorneys for the Government can take to protect victims and witnesses from intimidation.

Pub.L. 97–291, § 6(a)(2).

However, section (b) of the Objectives reads:

(b) Nothing in this title shall be construed as creating a cause of action against the United States.

*Id.* § 6(b).

The legislative history of the Objectives fully supports the clear meaning of that language in section (b). For example, the Senate Report on the Objectives states:

Like Wisconsin's, the statutes of other States generally enumerate certain "rights" which victims and witnesses should be able to expect from the justice system. In most instances, the statutes do not assign responsibilities for enforcing the rights, do not provide sanctions for failing to implement them, and do not create a cause of action by private citizens to have the rights enforced. Thus, the "rights" are more properly called "guidelines" as they are termed in S. 2420. Experience has shown that the State guideline legislation on which this section is modeled has been extremely helpful and that implementation, once institutionalized, is relatively routine.

13. 18 U.S.C. § 1512 is entitled "Tampering with a witness, victim, or an informant" and establishes criminal penalties for killing, intimidating, or threatening witnesses in federal proceedings, or attempting so to do. As is more fully explained in Part III of this opinion, *infra,* what is codified at 18 U.S.C. § 1512 note are the congressional Objectives pursuant to which the Attorney General was directed by Congress to promulgate appropriate guidelines for the protection of victims and cooperating witnesses. The actual guidelines were not finally issued until July 9, 1983, *i.e.,* after the relevant time period in this case. In analyzing the congressional Objectives in the light of the doctrine of qualified immunity, this Court assumes, *arguendo* only, that the Objectives themselves represent a "statutory right."

S.Rep. No. 532, 97th Cong., 2d Sess. 39, *reprinted in* 1982 U.S. Code Cong. & Admin. News 2515, 2545.

That same Senate report later states:

Subsection [ (b) ] expressly states that nothing in the title shall be construed as creating a cause of action against the United States. The Committee is confident that the Attorney General will promulgate realistic guidelines and assign responsibility for them in such a way as to assure implementation to the maximum extent possible. Where implementation is not possible for budgetary or other reasons, the Committee does not wish to make the federal government liable.[14]

*Id.* at 42, 1982 U.S. Code Cong. & Admin. News at 2515, 2548.

In *Davis v. Scherer, supra,* Justice Powell noted that defendant officials do not lose the defense of qualified immunity simply because their conduct "violates *some* statutory or administrative provision." 468 U.S. at 194, 104 S.Ct. at 3019 (emphasis added; footnote omitted). Rather, as Justice Powell explained, "officials become liable for damages only to the extent that there is a clear violation of the statutory rights *that give rise to the cause of action for damages.*" *Id.* at 194 n. 12, 104 S.Ct. at 3019 n. 12 (emphasis added). *See also, Carson v. Block,* 790 F.2d 562, 564 (7th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 669, 93 L.Ed.2d 721 (1986); *Ricci v. Key Bancshares of Maine, Inc.,* 768 F.2d 456, 467 (1st Cir.1985). However, the Objectives themselves do not furnish such an independent cause of action.

Accordingly, because plaintiffs have failed to allege that the individual defendants violated any clearly established principle of constitutional law, this Court hereby reaffirms its earlier dismissal of the individual defendants in their individual capaci-

ties based on the doctrine of qualified immunity.[15]

### III. *The Federal Tort Claims Act*

Plaintiffs also bring claims against the United States under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671–80. In pertinent part the FTCA reads:

(b) Subject to the provisions of chapter 171 of this title, the district courts ... shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant *in accordance with the law of the place where the act or omission occurred.*

28 U.S.C. § 1346(b) (emphasis added). Plaintiffs allege that Savage and Ryan should have known of Grandison's record of violence, and that because of that knowledge and the information given to them by the Piechowiczes on March 14, 1983, they had a duty to protect Cheryl and David and/or to warn them of the dangers of testifying so that the Piechowiczes could have sought protection on their own. It is undisputed that the government neither offered to protect the Piechowiczes nor warned them of such danger. It is also undisputed that neither David nor Cheryl ever requested protection from the government. Plaintiffs, however, assert that, in an attempt to lull Cheryl and David into a false sense of security, the government did not clarify the situation for them, and that Cheryl and David relied upon what plaintiffs characterize as "representations" by

**14.** It is arguable that that report suggests the understanding of the Senate Committee that no then-existing provision of law rendered the federal government so liable.

**15.** *See* note 1, *supra.* To the extent that the complaint can be read as suing the individual defendants Savage and Ryan under the FTCA or in their official capacities, those defendants are hereby dismissed. Under the FTCA, the United

States is the only proper defendant in connection with a claim of wrongdoing against a federal official in his official capacity. *See, e.g. Woods v. United States,* 720 F.2d 1451, 1452 n. 1 (9th Cir.1983); *Artis v. Petrovsky,* 638 F.Supp. 51, 53 (W.D.Mo.1986) ("suits against federal officers in their 'official capacities' are in reality suits against the United States Government" (citation omitted)).

the government which were not "honest."[16]

▪ The United States has filed a motion for summary judgment, seeking dismissal of plaintiffs' claims against it on the grounds that this Court lacks subject matter jurisdiction over such claims because the United States has not waived its sovereign immunity with respect to them.[17] In so doing, the United States relies upon the so-called "discretionary function exception," one of the several subject matter jurisdiction exceptions to the FTCA listed in 28 U.S.C. § 2680. The discretionary function exception reads:

> The provisions of this chapter and section 1346(b) of this title shall not apply to—
>
> (a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, *whether or not the discretion involved be abused.*

28 U.S.C. § 2680(a) (emphasis added). If the alleged failure of the United States' employees Savage and Ryan to warn and/or to protect the decedents arises out of the exercise of a discretionary function, this Court has no subject matter jurisdiction over plaintiffs' claims; Congress, in enacting the FTCA, chose not to waive its sovereign immunity where discretionary functions are involved. *See United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980); 14 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 3654 (2d ed. 1985). Whether a particular governmental action is or is not a discretionary function presents a question of federal law. *See United States v. Muniz,* 374 U.S. 150, 164, 83 S.Ct. 1850, 1858–59, 10 L.Ed.2d 805 (1963).[18]

The leading case dealing with the scope of the discretionary function exception is *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), in which claims of negligence arose out of the explosion of ammonium nitrate fertilizer within the control of the government. In *Dalehite,* Justice Jackson noted that the exception includes both the initiation of programs and the establishment of specifications and schedules. *See* 346 U.S. at 35–36, 73 S.Ct. at 968. The key factor in applying the exception lies in whether the official was exercising his judgment:

> Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of *subordinates* in carrying out the operations of government in accordance with official directions cannot be actionable. If it were

**16.** Complaint, ¶ 18(c); Plaintiffs' Response to Defendant's Motion for Summary Judgment, at p. 7.

**17.** The United States has styled its motion as one for summary judgment. A summary judgment motion may be an improper vehicle for challenging lack of jurisdiction under Fed.R. Civ.P. 12(b)(1). *See Bernitsky v. United States,* 620 F.2d 948, 956 (3d Cir.), *cert. denied,* 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980); *Pelham v. United States,* 661 F.Supp. 1063, 1065–66 & n. 1 (D.N.J.1987). It is also to be noted that plaintiffs have the burden of establishing subject matter jurisdiction. For purposes of this opinion, that requirement is met because all of plaintiffs' allegations of relevant and material facts are taken as true.

**18.** Some of plaintiffs' allegations can fairly be construed as presenting a claim for misrepresentation; that is, that the United States misled Cheryl and David about the dangers of testifying by telling them not to worry about Grandison's threats against them, and that David and Cheryl relied upon those misrepresentations.

To the extent plaintiffs make any claim of misrepresentation, this Court lacks subject matter jurisdiction over the same. 28 U.S.C. § 2680(h) bars claims for both negligent and intentional misrepresentation. *Block v. Neal,* 460 U.S. 289, 295–97, 103 S.Ct. 1089, 1093–94, 75 L.Ed.2d 67 (1983); *see also, e.g., Wells v. United States,* 655 F.Supp. 715, 723–24 (D.D.C.1987); *Cole v. United States,* 651 F.Supp. 221, 225 (N.D. Fla.1986); *King v. United States Forest Service,* 647 F.Supp. 20, 22 (N.D.Cal.1986). While neither party has specifically presented any issue relating to misrepresentation, this Court deals with it *sua sponte* since it relates to an issue of subject matter jurisdiction. *See Cook v. Georgetown Steel Corp.,* 770 F.2d 1272, 1274 (4th Cir. 1985).

not so, the protection of § 2680(a) would fail at the time it would be needed, that is, when a *subordinate* performs or fails to perform a causal step, each action or nonaction being directed by the superior, exercising, *perhaps abusing,* discretion.

*Id.* at 36, 73 S.Ct. at 968 (footnote omitted; emphasis added).

More recently, in *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), involving alleged negligence by the Federal Aviation Administration in issuing certificates concerning the use of certain aircraft in commercial aviation, the Supreme Court expressly relied upon *Dalehite*'s interpretation of the discretionary function exception. *See* 467 U.S. at 811–13 & n. 10, 104 S.Ct. at 2763–64 & n. 10. Writing in *Varig,* Chief Justice Burger elaborated as follows upon when the exception should be applied:

> [I]t is the *nature of the conduct, rather than the status of the actor,* that governs whether the discretionary function exception applies in a given case.... [T]he basic inquiry concerning the application of the discretionary function exception is whether the challenged acts of a Government employee—*whatever his or her rank*—are of the *nature and quality* that Congress intended to shield from tort liability.

*Id.* at 813, 104 S.Ct. at 2764 (emphasis added).[19] Chief Justice Burger also stressed the underlying basis for the exception; namely, that "Congress wished to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* at 814, 104 S.Ct. at 2765.

In analyzing whether the acts of defendants Savage and Ryan in failing to warn or protect decedents were of "the nature and quality that Congress intended to shield from tort liability," the question arises as to whether Savage and Ryan acted pursuant to a mandatory duty imposed upon them, or whether Congress left the policy choice to their discretion. In *Staton v. United States,* 685 F.2d 117 (4th Cir.1982), the Fourth Circuit adopted the following test, previously used by the Tenth Circuit, in determining whether such a duty exists:

> "Generally speaking, a duty is discretionary if it involves judgment, planning, or policy decisions. It is not discretionary if it involves enforcement or administration of a mandatory duty at the operational level, even if professional expert evaluation is required. Concisely stated, the rule is that if *a government official in performing his statutory duties must act without reliance upon a fixed or readily ascertainable standard,* the decision he makes is discretionary and within the exception of the Tort Claims Act."

*Staton,* 685 F.2d at 120 (emphasis added) (quoting *Barton v. United States,* 609 F.2d 977, 979 (10th Cir.1979)).[20] The existence of a fixed or readily ascertainable standard allows the district court to assess the defendant official's conduct without engaging

---

**19.** In addition to the "nature and quality" of the official's acts, the Chief Justice also suggested in *Varig* that the discretionary function exception would be especially likely to apply in situations where the government acted "in its role as a regulator of the conduct of private individuals." 467 U.S. at 813–14, 104 S.Ct. at 2764 (footnote omitted). While the subpoenaing of witnesses for testimony might arguably constitute the regulation of private individuals' conduct, in making this statement the Court was referring, at least principally, to actions of traditional regulatory agencies. *See id.* at 814 & n. 11, 104 S.Ct. at 2764 & n. 11. It is clear, however, that § 2680(a) and the analytical approach set forth in *Varig* apply to governmental activities other than those of regulatory agencies. *See id.* at 814, 104 S.Ct. at 2764–65; *see also Allen v. United States,* 816 F.2d 1417, 1422 (10th Cir.

1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 694, 98 L.Ed.2d 647 (1988).

**20.** The test set forth in *Staton* predates *Varig's* elaboration upon the meaning of § 2680(a). However, the *Staton* test is entirely consistent with *Varig's* approach, and the type of analysis which *Staton* entails has been employed, by post–*Varig* courts. *See, e.g., Weiss v. United States,* 787 F.2d 518, 523–24 (10th Cir.1986) (explicitly applying *Barton* test adopted in *Staton*); *Allen v. United States,* 816 F.2d 1417, 1424 (10th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 694, 98 L.Ed.2d 647 (1988); *Collins v. United States,* 783 F.2d 1225, 1231 (5th Cir.1986). *Accord, Bowman v. United States,* 820 F.2d 1393, 1395 (4th Cir.1987); *Baxley v. United States,* 767 F.2d 1095, 1097–98 (4th Cir.1985).

in the sort of judicial "second-guessing" which the discretionary function exception was intended to prevent. *See Bowman v. United States,* 820 F.2d 1393, 1395 (4th Cir.1987).

*Staton* involved a claim under the FTCA brought by a dog owner whose dog had been shot and killed by a park ranger in the Shenandoah National Park. The United States argued that shooting the dog was a discretionary act not actionable because of § 2680(a). In particular, the government relied upon 36 C.F.R. § 2.8(d), which provides in part that " '[d]ogs ... running at large ... *may* be disposed of in the interest of public safety and protection of wildlife.' " 685 F.2d at 120 (emphasis that of the court in *Staton* ). Judge Ervin noted that the use of the word "may" suggested that the Park Service intended its rangers "to have discretion in applying the regulation," *id.,* but he also noted that, as a matter of practice, the Park Service had routinely captured and impounded dogs rather than shooting them. *Id.* Indeed, no dog had been shot in the park for twenty years prior to *Staton. Id.* at 120–21. Furthermore, the day the plaintiff's dog was shot, the Park Service had distributed a leaflet expressly stating that runaway dogs " 'will be caught and impounded,' " and describing the methods of capture. *Id.* at 119, 120–21.

In the light of the manner in which the regulation had been consistently applied in practice, the Fourth Circuit concluded in *Staton* that whatever discretion may have been originally conferred by the regulation had already been exercised by the establishment of a no-shooting policy:

> By establishing such a policy, Ranger Bowen's superiors had interpreted 36 C.F.R. § 2.8(d) in such a manner that field ranger personnel no longer had discretion because "a fixed or readily ascertainable standard" had been established.... We find, therefore, that shooting dogs did not fall within the dis-

cretionary function exception to the Federal Tort Claims Act.

*Id.* at 121 (citation omitted).

■ In the instant case, plaintiffs allege that Savage and Ryan failed to take any steps either to protect decedents, or to warn them of any danger in testifying against a criminal defendant whom Savage and Ryan knew had threatened them and had also threatened and injured a witness in a prior criminal case. Accepting those allegations as true,[21] the critical inquiry is whether Savage and Ryan acted, or failed to act, in contravention of a "fixed or readily ascertainable standard," 685 F.2d at 120, the existence of which would indicate that their acts were not of the "nature and quality that Congress intended to shield from tort liability." *Varig,* 467 U.S. at 813, 104 S.Ct. at 2764.

In contending that such a "fixed or readily ascertainable standard" did exist during the relevant time frame in this case, plaintiffs rely upon *Martinez* and its progeny discussed in Part II, *supra.* For the reasons stated in that Part, this Court concludes that such a standard did not exist in the relevant time frame.

Plaintiffs also, however, rely heavily upon two cases which involved federal court witnesses, namely, *Swanner v. United States,* 406 F.2d 716 (5th Cir.1969), on appeal from 275 F.Supp. 1007 (M.D.Ala. 1967) and, on remand, 309 F.Supp. 1183 (M.D.Ala.1970), and *Miller v. United States,* 530 F.Supp. 611 (E.D.Pa.1982) and 561 F.Supp. 1129 (E.D.Pa.1983), *aff'd mem.,* 729 F.2d 1448 (3d Cir.1984).[22]

In *Swanner,* plaintiff Jessie Swanner and members of his family brought suit against the United States under the FTCA. Swanner was a "special employee" of the Alcohol and Tobacco Tax Division of the Internal Revenue Service. He had been involved in investigations of illicit whiskey operations, had already testified against persons accused of violating internal revenue laws, and was scheduled to testify

---

21. *See* note 17, *supra.*

22. *Swanner* was decided long before *Varig. Miller* was decided in 1983 and affirmed on

February 8, 1984, several months before the Supreme Court filed its opinion in *Varig* on June 19, 1984.

further in that regard. One of the persons under investigation, Ed McGlocklin, discovered that Swanner was an undercover agent and stated that Swanner would never testify against him. The government, aware of the threats against Swanner, advised Swanner that "he was safe from McGlocklin as long as he remained in Alabama." 309 F.Supp. at 1186. "Swanner made no specific request for protection" from the government, nor did he receive any "protection" of any sort. *Id.* Swanner's house was subsequently bombed, and he and several members of his family were injured. *Id.* at 1186–87.

In *Swanner*, Judge Johnson, in holding inapplicable the discretionary function exception, cited in his first decision to *Rayonier v. United States*, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957), *see* 275 F.Supp. at 1010, and, in his opinion on remand, to *Rayonier, United States v. Muniz, supra,* and *Cohen v. United States,* 252 F.Supp. 679 (N.D.Ga.1960). *See* 309 F.Supp. at 1187. *Muniz* and *Cohen* were cases in which plaintiff-inmates were injured because of the negligence of federal correctional officers in failing to afford plaintiffs appropriate protection from fellow inmates. *Rayonier* involved the negligence of federal Forest Service employees who had assumed "exclusive direction and control" of certain "fire suppression activities." *Rayonier,* 352 U.S. at 316, 77 S.Ct. at 375. In all of these cases, the federal officers had undertaken duties and negligently performed them. In *Swanner,* certain actions to protect Swanner had been taken by the federal officers, but Swanner did not specifically ask for protection, 309 F.Supp. at 1186, and Judge Johnson wrote that the duty to protect *Swanner* under the circumstances of the case arose "without the necessity for a formal request" by him or members of his family. *Id.* at 1187.

■ Discussing the government's claim of the application of the discretionary function exception, Judge Johnson held, in reliance on *Rayonier, Muniz,* and *Cohen,* that "decisions not to provide protection to persons the United States is under a duty to protect are not within [that exception]." 275 F.Supp. at 1010; *see also* 309 F.Supp. at 1187. If by that statement *Swanner* stands for the proposition that the discretionary function exception of 28 U.S.C. § 2680(a) is inapplicable when a duty to protect exists under state law, this Court, in a post–*Varig* setting, respectfully disagrees. Section 1346(b) calls for the application of the law of the state where the alleged negligence took place.[23] But section 1346(b) does not come into play unless the federal district court has subject matter jurisdiction under section 2680(a)—and that jurisdiction is lacking if the discretionary function exception of section 2680(a) is applicable. Whether the discretionary function exception applies is controlled by federal law; a court must ascertain whether Congress intended to waive sovereign immunity.[24] Thus, even if under the circumstances of this case Maryland state law imposes upon Savage and Ryan the duty to protect the Piechowiczes,[25] the existence of that state law duty would not in and of itself prevent the discretionary function exception from applying. *See Merklin v. United States,* 788 F.2d 172, 174 (3rd Cir. 1986) (application of New Jersey's "Good Samaritan" doctrine barred by § 2680(a));[26] *Wells v. United States,* 655 F.Supp. 715, 719 (D.D.C.1987) (even if "Good Samaritan" doctrine exists under Texas law so as to impose duty on federal officials, that does not circumvent § 2680(a)). *Accord, Chrisley v. United States,* 620 F.Supp. 285, 290–91 (D.S.C.1985), *aff'd mem.,* 791 F.2d 165 (4th Cir.1986) (examining existence of

23. *See* the discussion *supra* at p. 494.

24. *See* the discussion *supra* at pp. 494–95.

25. *See* note 33, *infra.*

26. First, we must ascertain whether "the challenged acts of a Government employee—whatever his or her rank—are of the nature and

quality that Congress intended to shield from tort liability." *Varig Airlines,* 104 S.Ct. at 2765. On this point, we must be mindful that Congress designed the exception to preclude the application of the Act to agency decisions involving policy judgments. *Id.* at 2764. *Merklin,* 788 F.2d at 174.

duty under state law only after assuming *arguendo* that defendant's action was not discretionary under federal law; court had also determined that action *was* discretionary so that it lacked subject matter jurisdiction over claim).

In *Miller v. United States*, 530 F.Supp. 611 (E.D.Pa.1982) and 561 F.Supp. 1129 (E.D.Pa.1983), *aff'd mem.*, 729 F.2d 1448 (3d Cir.1984), one of the plaintiffs, Bruce Johnston, Jr., was a state prison inmate who was cooperating with federal and state authorities in the investigation of a series of burglaries and thefts committed by members of Johnston's family. Johnston had previously testified before a grand jury about those criminal activities. Johnston specifically discussed protection with law enforcement officials, and although he initially refused protection, the officials told him "more than once that if [Johnston] changed his mind, . . . he should call [a certain government official] . . . to arrange [for] . . . protection." 561 F.Supp. at 1130.

In order to insure Johnston's protection, the government transferred him to a different prison, and then released him. During the week immediately following his release, he lived with one Robin Miller. During that week, Johnston received calls from his family which caused him to fear for his life. He therefore decided to accept the government's offer of protection and called law enforcement officials four separate times to request such protection. However, less than a week after Johnston was released from prison, he and Robin Miller were ambushed; Johnston was injured and Miller was killed.

The government in *Miller* argued that the Witness Protection Program established by the Organized Crime Control Act of 1970, Pub.L. 91–452, 84 Stat. 933–34 (codified at prec. 18 U.S.C. § 3481) did not *require* the government to place Johnston in the program,[27] that there was no com-

mon law duty upon the government to protect Johnston, and that, in any event, the discretionary function exception was applicable. Finding that in enacting the Organized Crime Control Act of 1970, Congress did not intend to limit the FTCA's waiver of sovereign immunity, and analyzing and applying Pennsylvania's "Good Samaritan" rule, Judge Lord held that Pennsylvania law imposed a duty to protect Bruce Johnston, Jr. under the circumstances involved. Earlier, Judge Luongo had concluded that even though the decision by the government to protect or not to protect Johnston may have been within the discretionary function exception, the government agents, having made the decision to protect, were not shielded by that exception in connection with their "negligent execution" of the decision to protect. 530 F.Supp. at 615.

Judge Lord's approach is consistent with indications in the case law that once federal government officials affirmatively decide to undertake to carry out a duty, the discretionary function exception of section 2680(a) may not be applicable if those officials perform that duty negligently, even though their decision whether or not initially to undertake that duty was itself discretionary. *See Staton,* 685 F.2d at 121; *see also Bacon v. United States,* 810 F.2d 827, 829 (8th Cir.1987); *Mandel v. United States,* 793 F.2d 964, 966–67 (8th Cir.1986); *Jet Industries, Inc. v. United States,* 777 F.2d 303, 305 (5th Cir.1985), *cert. denied,* 476 U.S. 1115, 106 S.Ct. 1971, 90 L.Ed.2d 655 (1986). Unlike *Miller,* however, in the instant case it is undisputed that the government never offered to protect Cheryl and David, nor did the Piechowiczes seek such protection.[28] Plaintiffs themselves characterize the issue as whether the government *should* have warned the Piechowiczes and/or *should* have offered to protect them. Plaintiffs' Response to Defendant's Motion for Summary Judg-

---

27. That Witness Protection Program has been repealed and replaced by the Witness Security Reform Act of 1984, 18 U.S.C. §§ 3521–28. *See* 18 U.S.C. § 3521 note.

28. *See* Deposition of Cheryl Ann Piechowicz at pp. 49–50; Cheryl Ann Piechowicz's Answers to

Interrogatories 8, 9, and 10; John I. Kennedy, Jr.'s Answers to Interrogatories 6 and 7. Each of those documents is attached as an exhibit to the Motion for Summary Judgment filed by the government in this case.

ment, at p. 7. Thus, in this litigation plaintiffs cannot avail themselves of the legal principle underlying the court's decision in *Miller.*

The distinction drawn between *Miller* and the instant case is fully compatible with the trend in the case law since *Varig.* Absent a specific statute or regulation requiring the federal government to warn and/or to protect private citizens, and absent the government's undertaking so to warn or to protect, the discretionary function exception is applicable. *See, e.g., Berkovitz by Berkovitz v. United States,* 822 F.2d 1322, 1324 n. 4 (3d Cir.1987), *cert. granted,* —— U.S. ——, 108 S.Ct. 692, 98 L.Ed.2d 645 (1988) (plaintiff conceded that claim against FDA for negligent failure to warn of defective polio vaccine or withdraw it from market was barred because of the discretionary function exception);[29] *In re Consolidated United States Atmospheric Testing Litigation,* 820 F.2d 982, 996–99 (9th Cir.1987) (government's alleged failure to warn of radiation danger from nuclear testing or to take adequate safety precautions resulted from exercise of discretionary function); *Allen v. United States,* 816 F.2d 1417, 1423–24 & n. 8 (10th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 694, 98 L.Ed.2d 647 (1988) (government's failure to warn and/or to protect public from radioactive fallout stemming from Nevada bomb testing was protected from suit; the Tenth Circuit noted that most post–*Varig* cases were in accord); *Barnson v. United States,* 816 F.2d 549, 553 (10th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 229, 98 L.Ed.2d 188 (1987) (government's failure to warn uranium miners of radiation hazards was discretionary); *Bacon v. United States,* 810 F.2d 827, 829–30 (8th Cir.1987) (EPA's failure to warn workers of presence of dioxin or to protect them from it was not actionable); *Merklin v. United States,* 788 F.2d 172, 174–75 (3d Cir.1986) (Atomic Energy Commission's failure to inspect plant for dangerous radioactive materials which

harmed plaintiff was an exercise of discretion); *Jet Industries, Inc. v. United States,* 777 F.2d 303, 305–06 (5th Cir.1985), *cert. denied,* 476 U.S. 1115, 106 S.Ct. 1971, 90 L.Ed.2d 655 (1986) (government's failure to warn plaintiff of the risk of doing business with a federal probationer and protected witness was discretionary); *Taitt v. United States,* 770 F.2d 890, 894 (10th Cir.1985) (decision not to inform law enforcement officials of a dangerous offender's release from prison was discretionary and barred recovery by parents of a person murdered by that offender); *Begay v. United States,* 768 F.2d 1059, 1064–66 (9th Cir.1985) (government not liable for failing to warn plaintiff miners of dangers of radiation in mines even though it was conducting study on miners to determine effects of that radiation); *Cisco v. United States,* 768 F.2d 788, 789 (7th Cir.1985) (per curiam) (EPA not liable either for failure to warn plaintiffs that dirt in landfill was contaminated by dioxin, or for failure to protect plaintiffs from exposure); *Wells v. United States,* 655 F.Supp. 715, 717–21 (D.D.C.1987) (EPA not liable for failure to warn plaintiffs of lead pollution in their neighborhood or to correct contamination); *King v. United States Forest Service,* 647 F.Supp. 20, 21–22 (N.D.Cal.1986) (defendant's failure to warn public of dangerous river conditions not actionable); *see also, e.g., Hylin v. United States,* 755 F.2d 551 (7th Cir.1985) (after remand from Supreme Court, prior decision reversed in the light of *Varig* ).

In the light of *Varig* and post–*Varig* case law, the government in this case is able successfully to interpose the discretionary function exception of section 2680(a) and its jurisdictional bar against plaintiffs. Herein, the case law simply does not establish the existence of a "fixed or readily ascertainable standard" to guide Savage and Ryan. *See Staton,* 685 F.2d at 120. Thus, even if Savage's and/or Ryan's failure to protect the Piechowiczes was an

---

29. In *Berkovitz,* in a split decision, the Third Circuit concluded that its earlier decision in *Griffin v. United States,* 500 F.2d 1059 (3rd Cir. 1974), which held that a claim for "negligent protection" and distribution of a polio vaccine which subsequently caused the plaintiff's paralysis was not barred by the discretionary function exception, did not comport with the Supreme Court's "pronouncement in *Varig* on the scope" of that exception. 822 F.2d at 1323.

abuse of their discretion, section 2680(a) shields the United States from liability.

■ Plaintiffs have also cited this Court to the Objectives to the Federal Guidelines for Treatment of Crime Victims and Witnesses in the Criminal Justice System (the Objectives), Pub.L. 97–291, 96 Stat. 1256–57 (codified at 18 U.S.C. § 1512 note). Those Objectives became effective as law as of October 12, 1982, the effective date of the Victim and Witness Protection Act of 1982, see 18 U.S.C. § 1512 note, and therefore were in effect as of March and April 1983, the time frame relevant herein. Pursuant to the Objectives, the Attorney General had 270 days from October 12, 1982 to develop and implement guidelines for the Justice Department which were consistent with those Objectives. As the guidelines were not adopted until July 9, 1983,[30] they do not serve as the standard of conduct for defendants Ryan and Savage in March and April of 1983. *Cf. Baxley v. United States,* 767 F.2d 1095, 1097 & n. 2 (4th Cir.1985) (accident, which formed the basis of an FTCA claim, occurred during public comment period prior to FAA's formal adoption of regulations). However, even assuming that the statutory Objectives, which *were* in place at the time of the murders of plaintiffs' decedents, have the same status under section 2680(a) as the Justice Department's guidelines, the Objectives themselves do not represent the type of readily ascertainable standard required to remove the bar of the discretionary function exception.

**30.** The guidelines are for the internal use of the Justice Department and, as a body, do not appear to be published in the Code of Federal Regulations. Plaintiffs have placed in the record in this case a copy of the guidelines. *See* Ex. A to Plaintiffs' Supplemental Memorandum filed June 24, 1987. Plaintiffs agree that the guidelines were not adopted until July 9, 1983. Plaintiffs' Supplemental Memorandum of June 24, 1987, at p. 2.

**31.** *See also* the guidelines of July 9, 1983, *supra* note 30, which state in Part VII (Non–Litigability):

These guidelines provide only internal Department of Justice guidance. They are not intended to, do not, and may not be relied upon

As stated in Part II, *supra,* the relevant Objective reads as follows:

(2) **Notification of availability of protection.**—A victim or witness should routinely receive information on steps that law enforcement officers and attorneys for the Government can take to protect victims and witnesses from intimidation. Pub.L. 97–291, § 6(a)(2). As this Court also noted in Part II, *see* pp. 14–15, *supra,* section (b) of the 1982 legislation clearly reveals that the warning and/or protection of decedents pursuant to the congressional Objectives were acts "of the nature and quality that Congress intended to shield from tort liability." *Varig,* 467 U.S. at 813, 104 S.Ct. at 2764. Section (b) states:

Nothing in this title ... shall be construed as creating a cause of action against the United States.

Pub.L. 97–291, § 6(b). In addition, as this Court previously observed, the legislative history of section (b) confirms that Congress did not intend to waive sovereign immunity in that regard. *See* legislative history quoted *supra* at p. 15.[31]

The legislative history also makes clear that Congress enacted the above Objectives precisely because Congress believed that there were, up until that time, no existing official standards, customs, or practices which even recommended, let alone required, law enforcement officials to warn and/or protect persons in the decedents' position:

Federal law does not currently provide for the development of comprehensive guidelines for fair treatment of crime

to create any rights, substantive or procedural, enforceable at law by any person in any matter civil or criminal. Nor are any limitations hereby placed on otherwise lawful prerogatives of the Department of Justice.

This Court must be especially hesitant to predicate liability of the United States on the congressional Objectives. To premise liability on those Objectives for a cause of action which arose before the Attorney General had exercised the discretion delegated to him to implement the Objectives through whatever guidelines he deemed appropriate might well constitute "judicial second-guessing" of the type *Varig* meant to prevent. *See Begay v. United States,* 768 F.2d 1059, 1064 (9th Cir.1985).

 

victims and witnesses, nor does it address the specific objectives set forth in [this legislation]. No Federal executive policies set forth general or specific guidelines for fair treatment of victims and witnesses; nor are there executive branch initiatives to achieve the same result by way of policy statements or guidelines.

*Id.* at 37, 1982 U.S. Code Cong. & Admin. News at 2515, 2543. To the same effect, *see also id.* at 10, 1982 U.S. Code Cong. & Admin. News at 2515, 2516; *id.* at 39, 1982 U.S.Code Cong. & Admin. News at 2515, 2545; *A Bill to Protect Victims of Crime: Hearing on S. 2420 Before the Subcomm. on Criminal Law of the Senate Comm. on the Judiciary,* 97th Cong., 2d Sess. 87 (1982) [hereinafter "Hearing"] (statement of D. Lowell Jensen, Assistant Attorney General). In sum, it appears that there are no standards or practices upon which this Court can rely in assessing the defendants' conduct in this case.[32]

## IV. *Conclusion*

In the light of *Varig* and its progeny, as well as the command of section (b) of the 1982 congressional Objectives and that statute's legislative history, there was an absence during the relevant time frame of this case of a practice or of a well-known standard which limited the discretion or directed the actions of defendants Savage and Ryan. Accordingly, plaintiffs' claims against the United States in this case are barred by the discretionary function exception set forth in section 2680(a) of the FTCA. Therefore, the United States' motion for summary judgment on plaintiffs' FTCA claims will be granted.[33]

---

**32.** According to the legislative history of the 1982 statute, at the time of the enactment of the Objectives it was the practice in certain federal and state jurisdictions to provide services to victims and witnesses similar to those which were the focus of the congressional Objectives discussed herein. *See Hearing, supra,* at 82 (statement of Marlene Young, executive director of the National Organization for Victim Assistance); *id.* at 88–89 (statement of D. Lowell Jensen, Assistant Attorney General); *id.* at 168 (statement of E. Michael McCann, District Attorney, Milwaukee, Wisconsin, and chairman, ABA Victims Committee).

The legislative history does not indicate whether or not the policy of disseminating information about available protection to witnesses was part of the services provided in these jurisdictions, which were not specifically named. However, in any event, from the uncontradicted testimony and documents submitted in this case, it seems that such a policy was not in effect in the District of Maryland at the time the decedents were murdered. *See* Deposition of James C. Savage at pp. 67–68, 97, 99–100 (Ex. A to Plaintiffs' Response to Defendant's Motion for Summary Judgment); U.S. Attorneys' Manual, Title 9, § 9.21.310 (concerning representations and promises in Witness Protection Program) (March 6, 1980) (Ex. B. to United States' Motion for Summary Judgment). Nor at that time was it apparently the policy of DEA agents such as defendant Ryan to provide such information. *See* Deposition of John Ryan at pp. 50–53 (Ex. D. to United States' Motion for Summary Judgment).

The passage of the Victim and Witness Protection Act of 1982 did not impliedly repeal the FTCA because the provisions of the two acts are not in irreconcilable conflict. *See Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 154, 96 S.Ct. 1989, 1993, 48 L.Ed.2d 540 (1976) (quoting *Posadas v. National City Bank,* 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936)). In any event, Congress' intent to repeal the FTCA through passage of the Victim and Witness Protection Act is not clear and manifest. *See id.* Such implied repeals are not favored. *Id.* If at all possible, this Court has a duty to read the FTCA and the Victim and Witness Protection Act so as "to give effect to each if [it] can do so while preserving their sense and purpose." *Watt v. Alaska,* 451 U.S. 259, 267, 101 S.Ct. 1673, 1678, 68 L.Ed.2d 80 (1981); *see also, e.g., Radzanower,* 426 U.S. at 155, 96 S.Ct. at 1993–94; *Lanehart v. Devine,* 615 F.Supp. 1300, 1305 (D.Md.1985). Herein, the way in which this Court can give both statutes effect is by concluding that the discretionary function exception precludes the application of the FTCA to plaintiffs' claims in this case.

**33.** Under the circumstances, this Court need not consider the other defenses raised by the government, including the alleged failure of one or more plaintiffs to file administrative claims under the FTCA, and whether or not plaintiff Sherrie Waldrup was David Piechowicz's legally adopted daughter with a right to claim damages for his death. Nor need this Court resolve the difficult issue of whether plaintiffs have stated a cognizable claim under Maryland law. As pre-

viously noted, under 28 U.S.C. § 1346(b) the law of Maryland would have determined the extent of the duties of Savage and Ryan and what liability, if any, the United States had towards plaintiffs in this case if 28 U.S.C. § 2680(a) were inapplicable. In that event, careful considera-tion of Maryland case law, including *Ashburn v. Anne Arundel County,* 306 Md. 617, 510 A.2d 1078 (1986), *Lamb v. Hopkins,* 303 Md. 236, 492 A.2d 1297 (1983), and *Scott v. Watson,* 278 Md. 160, 359 A.2d 548 (1976) would have been re-quired.